LUCILE MC CREA EVANS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86161. Filed December 27, 1962.

*W. W. Berry, Esq.*, for the petitioner.
*Robert B. Milsten, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the calendar years 1955, 1956, and 1957 in the respective amounts of $3,392.79, $17,239.67, and $9,398.47.

The sole issue presented is whether payments in the amounts of $12,500 in 1955, $30,000 in 1956, and $17,500 in 1957 received by the petitioner from the former corporate employer of her deceased husband, constituted gifts excludable from her gross income under section 102(a) of the Internal Revenue Code of 1954 or are taxable as ordinary income under section 61(a) of the Code, subject to an exclusion of $5,000 pursuant to section 101(b) of the Code.

FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner is an individual, the surviving spouse of Silliman Evans, Sr., hereinafter referred to as "the decedent," residing in Davidson County, Tenn. She filed her income tax returns for the taxable years 1955, 1956, and 1957 with the district director of internal revenue at Nashville, Tenn.

At the time of his death on June 26, 1955, the decedent was the owner of 57.7 percent of the stock of Tennessean Newspapers, Inc.,

hereinafter referred to as the corporation, which publishes a morning and Sunday newspaper known as the Nashville Tennessean. At that time and at all times material herein the petitioner owned 4 percent of the stock of the corporation.[1]

The decedent became connected with the corporation in 1937 and had been its president at least since 1948. At the time of his death he was its president and publisher, with a salary of $61,215. Prior to her husband's death the petitioner had never been employed by the corporation and was not a director of the corporation.

At the time of the decedent's death he and the petitioner had two sons, Silliman Evans, Jr., who was employed by the corporation as assistant publisher, and Amon Carter Evans.

At the time of the decedent's death the directors of the corporation were the decedent, both of his sons, Russell L. Speights, Mrs. John M. Branham, Coleman A. Harwell, and one other unidentified person.

By his will, which was executed on October 3, 1953, the decedent appointed a bank and an individual as executors of his estate and as trustees of two trusts created by his will and designated as "Trust A" and "Trust B." By his will the decedent gave, devised, and bequeathed to the testamentary trustees all his residuary estate, consisting of his stock in the corporation and substantially all of his property other than his personal effects, to be placed in the two trusts. It was provided that each trust should receive one-half of the property in order that Trust A might qualify for the maximum marital deduction under the Federal estate tax laws. It was provided that the petitioner should receive the entire net income from Trust A for her life and she was given the exclusive power, exercisable by will, to appoint the entire corpus of Trust A in favor of her estate or others as she might elect.

In his will the decedent directed that his executors immediately arrange for the election of the petitioner as president of the corporation at a salary of $10,000 per year.[2] He also directed that, commencing at the time of his death, the petitioner should receive throughout her life, so long as she remained unmarried, a total amount of $15,000 per year, to be made up of salary and the remainder by payments by the trustees from income of the trusts, or from borrowing, if necessary; that the trustees should continue her as president of the corporation at such salary until such time as in their opinion they could pay her $15,000 per year from income of the trusts, without encroachment

---

[1] The record does not disclose the ownership of the remaining 38.3 percent of the stock of the corporation, except that Mrs. John M. Branham was a substantial stockholder. Nor does the record show whether Mrs. Branham or any other stockholders were related to the decedent and the petitioner in any manner.

[2] However, the will also provided "Notwithstanding anything herein above provided to the contrary, I direct my Trustees, and, so far as I can, the Directors, of Tennessean Newspapers, Inc., not to pay excessive salaries which cannot be justified as expenses for tax purposes, and direct that there be services rendered to justify any salaries to be paid."

upon corpus; and that if the petitioner should cease to be employed as president of the corporation, for any reason other than her refusal to serve as president, the trustees might encroach upon the principal of the trusts in order to continue the payments of $15,000 to her.

In his will the decedent expressed the wish that his trustees and the board of directors should employ his son, Silliman, Jr., as publisher of the corporation, and that his son, Amon, upon the completion of his education, should be employed by the corporation and assigned such duties as the trustees might approve. It was provided that the petitioner if living, or otherwise the trustees, should determine the amount, in addition to the salaries the sons might receive, which might be necessary to properly maintain them, and that the trustees should pay such amounts to the sons from the trust estate; and that the minimum amount to be received by each son should be $400 per month, including salary received. It was provided that decedent's son Amon, who was 20 years old at the time of the execution of the will, should receive an amount, not exceeding $3,000 per year, during the period he was completing his education.

The will provided that any unused income of Trust B should be added to corpus, that upon the death or remarriage of the petitioner the corpus of Trust B should be divided into two equal parts, one for each son, and that each son should receive the distribution of his share of corpus upon his attaining the age of 35 years, or upon the death or remarriage of the petitioner, whichever should occur later.

The decedent in his will directed the trustees to hold the stock of the corporation unless they should determine that to continue holding it might result in a substantial loss to the trust estate; that if they should determine that a sale of the stock should be made they should consult the top officials of the corporation and the petitioner; that the petitioner in turn should consult other designated individuals who were nonresident publishers; that the trustees could then sell the stock by and with the consent of the petitioner; and that if she should withhold her consent, the trustees could sell the stock but only with the unanimous approval of all the consultants.

The decedent directed that the trustees, before voting for directors of the corporation, should consult with the petitioner and the sons and with at least three other top employees of the corporation, and vote for directors who were approved by both the trustees and by the petitioner and the sons, and who would, among other things, consult with the petitioner as to policies of the paper and its personnel and consider and respect her wishes and desires insofar as compatible with good business management; and that the petitioner should be a director of the corporation as long as she was capable of acting and willing to serve. He also expressed the wish that his sons should be members of the board of directors so long as they were able and

willing to serve and that both they and the petitioner should be freely consulted regarding the business policy of the paper.

The will expressly authorized and empowered a majority of the adult beneficiaries of Trust A and Trust B to remove the trustees of the trusts, and to appoint a successor corporate trustee (which should be a bank or trust company having capital or surplus and undivided profits of at least $1,000,000). They were also empowered to appoint a successor individual trustee, but it was provided that his appointment should be confirmed by a court of competent jurisdiction, and it was provided that the individual appointed should be satisfactory to both the court and to a majority of such adult beneficiaries.

The stockholders of the corporation, at a meeting held on July 29, 1955, elected the petitioner and John H. Nye as new directors of the corporation and reelected as directors Silliman Evans, Jr., Amon Evans, Russell L. Speights,[3] Mrs. Branham, and Coleman A. Harwell. Immediately following the stockholders meeting on July 29, 1955, all seven members of the board of directors met and elected the petitioner president of the corporation with salary of $10,000 per annum,[4] Silliman Evans, Jr., as publisher with salary of $30,000 per year, and Speights as secretary and treasurer. At such meeting a salary of $3,600 per annum was fixed for Amon Carter Evans as vice president. The minutes of the directors meeting show that thereupon the following transpired:

The Treasurer then stated that under certain rulings and Court decisions hereinafter cited, the widow of a deceased officer of a corporation may receive gratuitous payments equal to the husband's salary for a limited period, usually not to exceed two years, and that such payments in the nature of gifts are deductible as business expenses in the corporation's return (Louise K. Aprill, 13 T.C. 707; Alice M. McFarlane, 19 T.C. 9; Bogardus v. Commissioner, 302 U.S. 34). Based thereon, the following resolution was unanimously adopted:

BE IT RESOLVED, That this corporation shall pay to Mrs. Lucile McCrea Evans, widow of Silliman Evans, President and Publisher of the Nashville Tennessean, the sum of $2,500.00 per month beginning in August, 1955 for a period of not to exceed two years. The payments are to be made voluntarily without any prior obligations to make such payments and without any benefits or services expected therefrom, it being understood that the husband was fully paid for his services during his life-time. The foregoing payments to the widow are intended as gifts to provide her with financial assistance. As pointed out by the Supreme Court in Bogardus v. Commissioner, 302 U.S. 34, "a gift is nonetheless a gift because inspired by gratitude for past faithful services."

The petitioner presided at the meeting of the directors following her election as president and the minutes were signed by her as chairman and by Speights as secretary.

---

[3] Speights, a certified public accountant, was hired by the corporation in 1948 and was its outside auditor prior to that time. He was in charge of the corporation's bookkeeping and prepared the tax returns of the corporation, the petitioner and, before his death, the decedent. He has never been a stockholder of the corporation.

[4] At the time of the trial the petitioner was still president of the corporation.

Speights originated the idea of having the corporation make these payments to the petitioner. He discussed the matter, including the tax consequences, with the corporation's financial adviser, and in collaboration with him drafted a proposed resolution. After obtaining the approval of the trustees of the testamentary trusts he presented and explained the resolution to the rest of the board of directors. He had a general knowledge of the petitioner's financial situation after the decedent's death. Speights had never discussed with the decedent the possibility of the corporation's making death payments to the petitioner, but he had discussed with the decedent the possibility of making the petitioner president of the corporation after the decedent's death.

At the time of the decedent's death the corporation did not owe the decedent or the petitioner any money.

The corporation had no plan for payments to the widows of deceased employees and prior to the decedent's death had never made any such payments.

Pursuant to the above resolution the corporation paid the following amounts directly to the petitioner: $12,500 in 1955; $30,000 in 1956; and $17,500 in 1957. These payments were in addition to petitioner's annual salary of $10,000 as president of the corporation. None of the stockholders ever objected to the making of these payments.

The decedent's gross estate amounted to $1,242,854.13, consisting of stocks and bonds valued at $927,423.44, mortgages, notes and cash of $105,517.54, insurance of $207,888.15, and other miscellaneous property of $2,025. The adjusted gross estate amounted to $1,147,462.57. The respondent determined that the value of property which passed from the decedent to the petitioner, qualifying for the marital deduction, amounted to $573,731.28. The Federal estate tax paid by the estate was $137,556.70 and the Tennessee inheritance tax paid was $42,195.66.

Substantially all the cash which the estate had was used to pay the estate and inheritance taxes. The decedent was entitled to a pension from the corporation, but it was payable to his estate, and it was used for the purpose of paying death taxes. The greater part of the decedent's life insurance was payable to the corporation. The petitioner was the beneficiary of one insurance policy on the decedent's life, under which she received $200 per month for a period of 10 years. Aside from this the petitioner did not directly receive any substantial amount of property or money from the estate, since substantially all the remaining property went into the two trusts.

After the decedent's death the petitioner was left with a large house to maintain, and she supported the wife and daughter of her son Amon who lived with her.

In her income tax return for the taxable year 1955 the petitioner reported adjusted gross income of $19,290.31 and taxable income of $16,254.21. Therein she claimed, and was allowed, as exemptions the wife and child of her son Amon. Her gross income for that year included salary from the corporation in the amount of $4,999.98, capital gains of $4,654.85, dividends of $1,375 (of which $1,200 was from the corporation), and rents and royalties from oil properties of $15,549.79.

In her income tax return for the taxable year 1956 the petitioner reported adjusted gross income of $23,612.80 and taxable income of $19,650.78. Her gross income for that year included salary from the corporation in the amount of $9,999.96, dividends of $1,659.05 (of which $1,600 was from the corporation), rents and royalties from oil properties of $11,492.65, and payments from the estate of the decedent of $5,000.

In her income tax return for the taxable year 1957 the petitioner reported adjusted gross income of $24,087.13 and taxable income of $20,446.69. Her gross income for that year included salary from the corporation in the amount of $9,999.96, dividends of $1,605.07 ($1,600 of which was from the corporation), rents and royalties from oil properties of $10,706.86, and payments from the estate of the decedent of $5,000.

In her income tax returns for the taxable years 1955, 1956, and 1957 the petitioner did not include in taxable income the respective amounts of $12,500, $30,000, and $17,500 received by her from the corporation pursuant to the above resolution. However, in each return she did make disclosure of the amount received as "widow's compensation" with the statement that the amount was a gift by the corporation and therefore not taxable.

In the notice of deficiency the respondent included in the petitioner's taxable income, as "payments to widow as widow of deceased officer" and as "widow's compensation," the above amounts of $12,500, $30,000, and $17,500 received by the petitioner in the taxable years 1955, 1956, and 1957, respectively, from the corporation, less, however, an exclusion of $5,000 for the taxable year 1955 pursuant to section 101(b) of the Internal Revenue Code of 1954.

In its income tax returns for the fiscal years ended March 31, 1956 and 1957, the corporation claimed, and the respondent allowed, deductions of "widow's compensation" paid to the petitioner in the respective amounts of $22,500 and $30,000. The corporation also claimed as deductions in its income tax returns for those fiscal years the amounts of $7,499.97 and $9,999.96, respectively, paid as compensation to the petitioner for her services as its president. In auditing these returns the respondent determined that the salary of $10,000 per year to the petitioner was excessive and allowed the corporation a deduction of an amount equal to $7,500 per year for salary and pension con-

tribution paid to and for the petitioner for her services as president of the corporation. The corporation agreed to this determination.

The payments of $12,500, $30,000, and $17,500 made by the corporation to the petitioner in the taxable years 1955, 1956, and 1957, respectively, were not intended to be, and were not, gifts.

OPINION.

The sole issue presented is whether the payments made by the corporation to the petitioner pursuant to the resolution of July 29, 1955, constitute gifts under section 102(a) of the Internal Revenue Code of 1954 [5] or taxable income under section 61(a) of the Code.[6]

The petitioner contends that the corporation intended to make a gift to her because of affection and respect for her and a charitable desire to relieve her financial condition, that the payments were not made because of any moral or legal duty or anticipated benefit to the corporation, and that hence the payments constituted nontaxable gifts to her.

The respondent contends that the record does not establish that the payments by the corporation were gifts within the meaning of the statute and that therefore such payments are taxable as ordinary income to the petitioner, subject to the exclusion, for 1955, of $5,000 pursuant to section 101(b) of the Code.[7]

Both parties cite the Supreme Court decision in *Commissioner* v. *Duberstein*, 363 U.S. 278, as authority for resolving the issue involved in this case. Although the factual situation in *Duberstein* differs from that present in the instant case, the Court there set forth the guiding criteria for determining whether a transfer without consideration constitutes a gift within the meaning of the statute. The Court stated in part:

> The course of decision here makes it plain that the statute does not use the term "gift" in the common-law sense, but in a more colloquial sense. This Court has indicated that a voluntary executed transfer of this property by one to another, without any consideration or compensation therefor, though a common-law gift, is not necessarily a "gift" within the meaning of the statute. For the Court has shown that the mere absence of a legal or moral obligation to make

[5] Sec. 102(a) provides as follows:
GENERAL RULE.—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.
[6] Sec. 61(a) of the Code provides in pertinent part as follows:
GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived * * *
[7] Sec. 101(b) of the Code provides in pertinent part as follows:
EMPLOYEES' DEATH BENEFITS.—
(1) GENERAL RULE.—Gross income does not include amounts received (whether in a single sum or otherwise) by the beneficiaries or the estate of an employee, if such amounts are paid by or on behalf of an employer and are paid by reason of the death of the employee.
(2) SPECIAL RULES FOR PARAGRAPH (1).—
(A) $5,000 Limitation.—The aggregate amounts excludable under paragraph (1) with respect to the death of any employee shall not exceed $5,000.

such a payment does not establish that it is a gift. *Old Colony Trust Co.* v. *Commissioner* 279 U.S. 716, 730. And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, *Bogardus* v. *Commissioner*, 302 U.S. 34, 41, it is not a gift. And, conversely, "[w]here the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." *Robertson* v. *United States*, 343 U.S. 711, 714. A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," *Commissioner* v. *LoBue*, 351 U.S. 243, 246; "out of affection, respect, admiration, charity or like impulses." *Robertson* v. *United States*, *supra*, at 714. And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention". *Bogardus* v. *Commissioner*, 302 U.S. 34, 43. "What controls is the intention with which payment, however voluntary, has been made." Id., at 45 (dissenting opinion).

The Government says that this "intention" of the transferor cannot mean what the cases on the common-law concept of gift call "donative intent." With that we are in agreement, for our decisions fully support this. Moreover, the Bogardus case itself makes it plain that the donor's characterization of his action is not determinative—that there must be an objective inquiry as to whether what is called a gift amounts to it in reality. 302 U.S., at 40. It scarcely needs adding that the parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter.

It is suggested that the Bogardus criterion would be more apt if rephrased in terms of "motive" rather than "intention". We must confess to some skepticism as to whether such a verbal mutation would be of any practical consequence. We take it that the proper criterion, established by decision here, is one that inquires what the basic reason for his conduct was in fact—the dominant reason that explains his action in making the transfer. * * *

* * * The conclusion whether a transfer amounts to a "gift" is one that must be reached on consideration of all the factors.

*       *       *       *       *       *       *

the question here remains basically one of fact, for determination on a case-by-case basis.

Since, as pointed out in the *Duberstein* opinion, the question whether a transfer amounts to a gift must be decided upon the basis of all the facts in a particular case, and therefore on a case-by-case basis, decisions in other cases, while they may be helpful, are not determinative.[3] The facts in the instant case differ materially from those in any of the decided cases.

---

[3] Among the recent cases in this field are *Estate of Martin Kuntz* v. *Commissioner*, (C.A. 6) 300 F. 2d 849, reversing a Memorandum Opinion of this Court, certiorari denied 371 U.S. 903; *United States* v. *Kasynski*, (C.A. 10) 284 F. 2d 143; *United States* v. *Frankel*, (C.A. 8) 302 F. 2d 666, certiorari denied 371 U.S. 903; *Olsen's* v. *Commissioner*, (C.A. 8) 302 F. 2d 671, reversing a Memorandum Opinion of this Court, certiorari denied 371 U.S. 903; *Martin* v. *Commissioner*, (C.A. 3) 305 F. 2d 290, affirming 36 T.C. 556, certiorari denied 371 U.S. 904; and *Smith* v. *Commissioner*, (C.A. 3) 305 F. 2d 778, affirming a Memorandum Opinion of this Court, certiorari denied 371 U.S. 904. See also *Poyner* v. *Commissioner*, (C.A. 4) 301 F. 2d 287, which vacated the decision in *Estate of Mervin G. Pierpont*, 35 T.C. 65, and remanded the case for further consideration in the light of any evidence which the parties might submit as to the relationship of the directors to the widow, the widow's stockholdings in the corporation, the recipient of the decedent's stock interest, the widow's personal financial status, and the knowledge or lack of knowledge of the directors of her financial status following the death of her husband.

Under the Supreme Court's decision, a transfer, in order to qualify as a gift in the statutory sense, must proceed from a detached and disinterested generosity, out of affection, respect, admiration, charity, or like impulses.

Upon a careful consideration of the record as a whole, including the evidence showing the control which the petitioner had over the corporation, we think that the payments in question did not proceed from such a detached and disinterested generosity, and that they do not qualify as gifts under the statute.

The fact that the resolution of the board of directors stated that the payments were intended as gifts is not conclusive, since the Supreme Court has made it clear that the transferor's characterization of his action is not determinative. Indeed, the resolution does not contain any expressions which would indicate that the payments were the result of a detached and disinterested generosity induced by the impulses enumerated by the Supreme Court, with the possible exception of the statement that the gifts were intended to provide the petitioner with financial assistance. The resolution itself does not disclose that the board of directors had considered petitioner's financial condition and decided that she was in need of financial assistance.

The only witness presented by the petitioner was Russell L. Speights who was one of the directors, although not a stockholder, who became secretary and treasurer of the corporation, and who drafted the resolution. He testified that his purpose in drafting the resolution, explaining it to the directors, and suggesting that it be passed, was to make the petitioner a gift and provide for her needs at that time during the period of administration of the estate when the estate was not going to have any cash and there was no likelihood that she would be able to receive funds from the estate. He stated that the directors felt that she needed the money because the husband's salary of about $61,000 per year had ceased at the time of his death and the petitioner was left with a large house, heavy personal expenses, and dependents, which included her youngest son and his wife and child.

Actually the evidence shows that the petitioner had available substantial income. By his will the decedent directed his executors and the testamentary trustees to provide, from the time of his death, a fixed annual income for the petitioner of $15,000, to be made up in part of salary to be paid to the petitioner as president of the corporation and in part of payments from the trust estate, and to borrow money for this purpose, if necessary. She was also the beneficiary of a life insurance policy which paid her $2,400 per year, and her income tax return for the taxable year 1955 shows that she had other income (in addition to $5,000 received in that year as salary from

the corporation) in excess of $20,000. Even though she was under the expense of maintaining a large home and caring for her son's wife and child, we think the evidence presented fails to show that she was in need of having provision made for financial assistance in this manner. Her son Amon had a salary of $3,600 and was assured of more under his father's will. Nor can we believe that the directors thought the petitioner was in need of financial assistance. She and her sons must have known of her other resources, and Speights, who prepared her income tax returns, testified that he had a general knowledge of her financial situation after the decedent's death. These four made up a majority of the board of directors.[9]

Also militating against a conclusion that the payments proceeded from a detached and disinterested generosity is the fact that the petitioner, or she and her sons, in a very real sense controlled the corporation. The petitioner owned directly 4 percent of the stock of the corporation and the two testamentary trusts owned 57.7 percent. There has been no showing by the petitioner of the ownership of the remaining 38.3 percent of the stock, except that a Mrs. John M. Branham was a substantial stockholder. Nor has there been any showing as to whether there was any relationship between the petitioner and any of the other stockholders or directors. By his will the decedent required the executors and the trustees to vote the stock for such directors, one of whom should be the petitioner, as might be approved by the petitioner and her two sons. Actually the petitioner and both sons were directors of the corporation who voted for the payments. Furthermore, under the will, the executors and the trustees were required to arrange for the petitioner to become president of the corporation. This they did and she continued to be president until the time of the trial of this case, being such at the time the payments in question were voted. By his will the decedent also provided that a majority of the trust beneficiaries, the petitioner and the sons, could remove the trustees and appoint others of their choice.

It is obvious from the resolution of the board of directors that it was hoped and expected that the payments would result in both a deduction to the corporation and nontaxable treatment of the payments in the hands of the petitioner. However, as pointed out by the Supreme Court, these hopes and expectations in themselves are not material in determining whether there was, in fact, a gift.

---

[9] On brief the petitioner argues that a statutory gift is not limited to payments to persons in financial need. Nevertheless, here the only reason advanced by the corporation for the payments was to provide the petitioner with financial assistance. There is no evidence that there was an intention of making the payments because of affection, respect, admiration, or like impulses regardless of need.

We think it unnecessary to make a conclusion as to the dominant reason for making the payments—that is, for example, whether it was to recognize, by way of additional compensation, the decedent's past services to the corporation, to pay petitioner for anticipated services, to make a bid for employee goodwill (see *Fifth Avenue Coach Lines, Inc.*, 31 T.C. 1080, affirmed and reversed on other issues (C.A. 2) 281 F. 2d 556, certiorari denied 366 U.S. 964), or to make a distribution to the petitioner in the nature of a dividend (see *Lengsfield* v. *Commissioner* (C.A. 5) 241 F. 2d 508, affirming a Memorandum Opinion of this Court).[10] We think it sufficient to state that on this record we cannot conclude that the dominant reason for making the payments was to make a gift to the petitioner within the meaning of the statute. It may be added that the fact that the corporation deducted the payments is some evidence, although not in itself conclusive, that the corporation did not regard the payments as gifts. See *Commissioner* v. *Duberstein, supra; Willkie* v. *Commissioner*, (C.A. 6) 127 F. 2d 953, affirming a Memorandum Opinion of this Court, certiorari denied 317 U.S. 659; and *Alex Silverman*, 28 T.C. 1061, affd. (C.A. 8) 253 F. 2d 849.

In view of our conclusions above, it is unnecessary to consider the further contention made by the respondent that Congress, by enacting section 101(b) of the 1954 Code and thereby extending the $5,000 exclusion to noncontractual payments, assumed that widows' payments do not qualify as gifts. See Rev. Rul. 62–102, 1962–28 I.R.B. p. 7.

In view of the foregoing we approve the respondent's determination.

Reviewed by the Court.

> *Decision will be entered for the respondent.*

WITHEY, *J.*, dissents.

---

[10] Of course, if the payments were corporate distributions, they should not have been allowed as deductions to the corporation. See *Barbourville Brick Co.*, 37 T.C. 7. However, the propriety of the allowance of these payments as deductions to the corporation is not before us for decision here.