Katharine Shaw Dickson v. Commissioner.
Dickson v. Commissioner
Docket No. 90755.
United States Tax Court
T.C. Memo 1964-191; 1964 Tax Ct. Memo LEXIS 146; 23 T.C.M. (CCH) 1161; T.C.M. (RIA) 64191; July 14, 1964
*146 The $41,250 voted for petitioner by Berlin & Jones on October 30, 1956, was not a voluntary act proceeding from detached and disinterested generosity, and hence was not a gift within the meaning of section 102 of the Internal Revenue Code of 1954. Seth H. Dubin, 521 5th Ave., New York, N. Y. for the petitioner. James Q. Smith, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income tax for the calendar years 1957 and 1958 in the amounts of $9,427.57 and $5,261.31, respectively. Petitioner has assigned as error the following: In determining the *147 taxable income for the years 1957 and 1958, the Commissioner erroneously included the amounts received by Katharine Shaw Dickson as a gift from Berlin & Jones, Inc., the employer of her deceased husband, Thomas Dickson. Findings of Fact Most of the facts were stipulated and are so found. Petitioner is the widow of Thomas Dickson who died testate on September 13, 1956. Petitioner filed her individual income tax returns for the calendar years 1957 and 1958 on the cash basis of accounting with the district director of internal revenue for the Upper Manhattan District of New York, N. Y.
At the time of his death, Thomas Dickson was president and chairman of the board of directors of Berlin and Jones Company, Inc., hereinafter sometimes referred to as Berlin & Jones. The original entry of Thomas Dickson in the affairs of Berlin & Jones was on June 29, 1921, when he was elected a member of the board of directors and was made first vice president of the company at the age of 34. He continued to be active in the affairs of Berlin & Jones until his sudden death in 1956. In 1956 Berlin & Jones and its predecessor had been in the envelope manufacturing business for some 113 years. *148 It was one of the largest concerns in the industry. One of the founders of the business was Henry C. Berlin, grandfather of petitioner and her sister Elsie B. Hemmens, [1] who was the wife of Henry J. Hemmens. Laura B. Shaw was the daughter of Henry C. Berlin and the mother of petitioner and Elsie. Petitioner and Thomas Dickson had one son Thomas Dickson, Jr., and one daughter Shirley Boyce. Elsie and Henry J. Hemmens had one son Henry J. Hemmens, Jr. In 1927, Berlin & Jones was practically bankrupt. In order to rehabilitate the company and place it on a sound financial basis, Thomas Dickson invested $100,000, and his wife, petitioner herein, invested $50,000. The company was reorganized so that the then 6,000 shares, representing an investment of $600,000, were changed to 8,000 shares of no par common stock representing an investment of $240,000, or a stated value of $30 per share. This remained the capitalization of Berlin & Jones at all times thereafter. The new stock was then issued as follows: No. of
Stockholder
Shares
Estate of Henry C. Berlin
3,297
Laura B. Shaw
236
Katharine Shaw Dickson
500
Elsie B. Hemmens
500
James S. Wiley
500
Thomas Dickson
2,967
Total
8,000
*149 The estate of Henry C. Berlin was a trust created by Henry C. Berlin for the benefit of his daughter, Laura B. Shaw, and his granchildren, petitioner and Elsie. In 1927 Thomas Dickson, Henry J. Hemmens, and Wiley were elected directors of Berlin & Jones. Wiley was elected president, Laura B. Shaw vice president, Thomas Dickson treasurer, George H. Richmond assistant treasurer, and George H. Berlin secretary. In 1929 Thomas Dickson acquired the 500 shares of Berlin & Jones then owned by Elsie, and in 1939 he acquired 230 of the 236 shares then owned by Laura B. Shaw. He gave 200 of the 230 shares to his wife, petitioner herein. This brought Thomas Dickson's holdings up to 3,497 shares and petitioner's holdings up to 700 shares, which together was more than 50 percent of the capitalization. Berlin & Jones carried $100,000 of life insurance on the life of its president, Wiley, and borrowed money on the policies. Wiley had become indebted to Berlin & Jones in the amount of $19,078.69 and had also borrowed $15,000 from Thomas Dickson, giving Dickson his 500 shares of stock as security. Wiley died on or about April 12, 1940. His widow Ellen Rice Wiley, as an individual and as executrix *150 of her husband's estate, made a claim against Berlin & Jones for the $100,000 of life insurance and for two years of compensation. This claim was settled by the widow's giving Berlin & Jones a general release including both of her specific claims in return for the company's releasing the estate of wiley from its indebtedness to the company of $19,078.69. However, in connection therewith, Thomas Dickson was to give the estate of Wiley $10,000 and release a debt owing from Wiley to Dickson in the amount of $15,000, in exchange for which the estate of Wiley would transfer to Dickson the 500 shares in Berlin & Jones owned by Wiley and would also release claim to proceeds of life insurance held by Dickson on the life of Wiley. After the death of Wiley, Thomas Dickson was elected president of Berlin & Jones and he served without compensation for the remainder of 1940 and all of 1941. Thereafter, from 1942 to 1950 his salary as president ranged from $9,000 to $20,000 and from 1951 to the date of his death it was $25,000 per annum, except for a period from February 8, 1954, to December 16, 1954, when Henry J. Hemmens, Jr., was president at an annual salary of $25,000. Since her retirement *151 from active service with Berlin & Jones in 1939 Laura B. Shaw had received either as salary or as a pension $4,000 per annum from Berlin & Jones and she continued to receive this amount until her demise in 1944. Following the death of Laura B. Shaw, the estate of Henry C. Berlin, at various times, made distributions of the Berlin & Jones stock held by it to petitioner and Elsie. The shares distributed to Elsie were sold to Charles Segal who was unrelated to any other stockholder, director, or officer of Berlin & Jones. Also, from time to time Thomas Dickson had made additional gifts of Berlin & Jones stock to petitioner, so that on January 1, 1956, the stockholders of Berlin & Jones were as follows: No. of
Stockholder
Shares
Thomas Dickson
3,471
Katharine Shaw Dickson
1,781
Thomas Dickson, Jr., in trust for Katha-
rine Shaw Dickson
1,099
Charles Segal
1,649
Total
8,000
Dividends were declared by the board of directors of Berlin & Jones and paid in the years and amounts as follows: Per
Year
Amount
Share
1944
$104,000 $13
1946
48,000
6
1947
80,000
10
1948
24,000
3
1949
24,000
3
1950
24,000
3
1951
48,000
6
*152 Thereafter, no further dividends were paid even though the company earned profits each year. This resulted from a determination by the board of directors to build up substantial cash reserves in order to purchase certain high-speed highly productive machinery being developed in Germany to replace equipment which had been purchased by the company in the 1920's. This changeover was necessary to maintain the company's competitive position in the highly competitive envelope industry. In 1956 the directors decided that the time to purchase the machinery still had not arrived and that the reserves should continue to be increased. On October 30, 1956, the board of directors of Berlin & Jones met at a special meeting. The following directors were present: Thomas Dickson, Jr.
(Chairman of the meet-
ing)
Duncan Whyte, Jr.
(Vice president)
William J. Coneys
(Vice president)
Girvan N. Snider
(An outside businessman,
neither an officer nor
employee of Berlin &
Jones, but a long-time
personal friend of
Thomas Dickson, De-
ceased)
Challen R. Parker
(Vice president of The
Hanover Bank)
Charles Segal
William W. Storey
(Secretary)
Henry Uttal
(Attorney for Berlin &
Jones)
*153 The remaining director, David Anchin, an independent investor, unrelated to the Dickson family but connected with Segal, was absent. Before the October 30, 1956, special meeting formally began, the directors discussed the financial condition of petitioner in view of the then recent death of her husband. All of the directors, with the possible exception of Segal, were familiar with the manner in which the Dicksons had lived, namely, that they owned a cooperative apartment on Park Avenue in New York City where they had lived for some 8 or 10 years and where they spent the majority of their time; that they habitually visited Hot Springs, Virginia, in the late summer for about a month and spent every winter in Hobe Sound, Florida. Prior to the Park Avenue address they had owned a place out on Long Island where they belonged to several clubs. During this period petitioner had an individual income of approximately $7,500 a year from her own properties. Notwithstanding the large amount of property then owned by petitioner, as later shown herein, the directors believed that petitioner might require additional cash to assist her in maintaining her then scale of living. After Snider, who *154 had been a lifetime personal friend and closest associate of the deceased for the longest portion of his business career, had spread upon the minutes three pages of "some important facts in kindly remembrance of him" to be engrossed and presented to petitioner and Thomas Dickson, Jr., Segal offered the following resolution which was put to a vote and unanimously carried: RESOLVED: that Berlin and Jones Company, Incorporated in appreciation of the loyal services rendered to the Company for over 33 years by the late Thomas Dickson, Sr. pay to his widow Mrs. Katharine Shaw Dickson a pension for a period of two years from October 1, 1956 in the following amounts: for the three months commencing October 1, 1956 at the rate of $25,000 per annum; and for the remaining 21 months commencing January 1, 1957 and ending September 30, 1958 at the rate of $20,000 per annum all payable in monthly installments on the 1st day of each month and every month for said period. Berlin & Jones accrued as a deduction in 1956 the sum of $41,250 salary expense and as an ordinary and necessary business expense. This amount was paid to petitioner by Berlin & Jones during the years 1956, 1957, and 1958 as follows: *155 1956
$ 6,250.03
1957
20,000.04
1958
14,999.94
Total
$41,250.01
Respondent did not disturb the accrual and deduction of $41,250 by Berlin & Jones but allowed the deduction. Petitioner included the $6,250.03 in income for 1956 but filed a claim for refund on September 24, 1958, because of an alleged erroneous inclusion. Although the year 1956 is not here involved, the respondent has offered to allow petitioner to exclude as income in 1956 $5,000 of the $6,250.03 under section 101(b)(2)(A) of the Internal Revenue Code of 1954, but that matter is still pending and is not being litigated here. In her 1957 and 1958 returns, petitioner did not report as income the amounts of $20,000.04 and $14,999.94 received in those years but attached to each return a rider in explanation. The rider attached to the 1957 return is as follows: On October 30, 1956, the Board of Directors of Berlin & Jones Co., Inc. (now Berjo Corporation since January 2, 1958) approved the voluntary payment to the taxpayer of the sum of $41,250 payable in monthly installments over a period of 24 months, which payment was in consideration and recognition of the valuable *156 services performed for that corporation by taxpayer's husband who died on September 13, 1956 and represented some-what less than two years salary at the rate paid to the decedent at the time of his death. During 1957 the monthly installments received by taxpayer aggregated $20,000.04. The taxpayer has never been employed by the corporation and has never performed any services for it. Accordingly, the payment by the corporation represents a gift to her and is excludable from gross income under the provisions of section 102 of the Internal Revenue Code of 1954. See L. K. Aprill, 13 T.C. 707. The rider attached to the 1958 return is substantially the same as the one attached to the 1957 return except for the year and the amount treated as a gift. The respondent determined that the two amounts of $20,000.04 and $14,999.94 were income to petitioner in 1957 and 1958, respectively, and in a statement attached to the deficiency notice, explained his determination as follows: It is held that the payments received by you during the years 1957 and 1958 from Berlin & Jones Co., Inc., now Berjo Corporation, are not excludable from gross income under the *157 provisions of Section 102 or any other Sections of the Internal Revenue Code of 1954. Accordingly, the amounts of $20,000.04 for the taxable year ended December 31, 1957 and $14,999.94 for the taxable year ended December 31, 1958, so excluded, have been restored to your gross income for 1957 and 1958, respectively. On December 28, 1957, Harrison Blaine, Inc., bought all of the assets of Berlin & Jones subject to its outstanding liabilities other than the accrual of $41,250 to petitioner, which amount is the subject of controversy in this case. Berlin & Jones also retained its right to Federal income tax refunds for 1955 and 1956. Harrison Blaine, Inc., paid Berlin & Jones $955,000 for its assets as aforesaid and then formed a new corporation, Berlin & Jones, Inc., which took over the assets and continued the same business operations. Berlin & Jones (the seller) changed its name to Berjo, Inc., which is still in existence. During all of the years of its existence, Berlin & Jones never had a formal pension plan or other formal plan of deferred compensation. It did, however, in addition to the payments and offsetting indebtedness of Wiley and the pension payments to Laura B. Shaw *158 of $4,000 per year, make payments of a month's salary and $200 per month until further notice to Henry J. Hemmens, Jr., upon his leaving for Army service in 1942, make payments of $1,833.33 per month from November 10, 1948, to December 31, 1949, to George W. Jones, executive vice president, by reason of his severance from the service, make payments of $1,250 per mouth from February 1, 1950, to July 31, 1950, to Allison B. Hart, vice president for about a year, by reason of his resignation, make payments at the rate of $15,000 per year from September 25, 1953, to December 31, 1953, to Harry J. Smith, vice president, by reason of his resignation, make payments at the rate of $9,100 per year from October 21, 1953, to January 30, 1954, to John Ertola, assistant treasurer, by reason of his resignation, and, on December 16, 1954, it settled for $6,000 a claim by Henry J. Hemmens, Jr., against the company for alleged breach of contract in the amount of $18,749.97. Berlin & Jones also carried group life insurance on all of its employees. Petitioner was not required to perform any services in consideration of the moneys she received from Berlin & Jones. She was not an officer or director *159 of the company and did not attend stockholders' meetings. The stock that she owned in the company was voted by her husband for her on proxy. During 1956, 1957, and 1958, petitioner's assets, exclusive of her stock interest in Berlin & Jones and in the cooperative apartment house in which she lived, totaled approximately $203,000, comprised of securities worth about $139,000 and cash of about $64,000. Petitioner, under the will of her husband, received 2,505 additional shares in Berlin & Jones, valued for estate tax purposes at $334,644.95, or $133.99 per share. At the same valuation, petitioner's 1,781 shares owned outright were worth $238,636.19 and the 1,099 shares held in trust were worth $147,255.01, or a total value of her stock interests in Berlin & Jones of $720,536.15 which, when added to the above-mentioned $203,000, makes petitioner's estate at the time of her husband's death worth approximately $923,536.15. Thomas Dickson's total gross estate was valued at $1,005,401.13 for estate tax purposes. After allowing total allowable deductions of $603,561.18 (which included bequests to petitioner of $401,839.95) and a specific exemption of $60,000, his taxable estate was $341,839.95. *160 Ultimate Findings of Fact The resolution of October 30, 1956, was not a voluntary act of Berlin & Jones proceeding from detached and disinterested generosity and did not constitute a gift to petitioner pursuant to section 102 of the Internal Revenue Code of 1954. The resolution was motivated in fact by a desire to compensate Thomas Dickson for past services. Opinion The issue in this case is whether the payments to petitioner in 1957 and 1958 by Berlin & Jones made by reason of the resolution of the board of directors of the company on October 30, 1956, were a gift and excludable from gross income under section 102 [2] of the Internal Revenue Code of 1954, as contended by petitioner, or whether the payments were ordinary income under section 61 [3] of the Code, as determined by the respondent. *161 Since the decision by the Supreme Court in Commissioner v. Duberstein, 363 U.S. 278 (1960), the issue is clearly "one of fact, for determination on a case-by-case basis." In so holding, the Supreme Court, among other things, said: The course of decision here makes it plain that the statute does not use the term "gift" in the common-law sense, but in a more colloquial sense. This Court has indicated that a voluntarily executed transfer of his property by one to another, without any consideration or compensation therefor, though a common-law gift, is not necessarily a "gift" within the meaning of the statute. For the Court has shown that the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. * * * And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature * * * it is not a gift. * * * A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," * * * "out of affection, respect, admiration, charity or like impulses." * * * And in this regard, the most *162 critical consideration * * * is the transferor's "intention." * * * "What controls is the intention with which payment, however voluntary, has been made." In all cases of this kind there are present certain criteria pointing toward a gift and other criteria pointing toward income. It is for us to determine which criteria is controlling. That, as the Supreme Court said, depends on the transferor's "intention." In the instant case (1) the payments were made to petitioner and not to her husbands estate; (2) there was no legal obligation on the part of Berlin & Jones to pay any additional compensation to Thomas Dickson or to his estate; and (3) petitioner performed no services for the corporation. These criteria all favor the gift side of the question. On the other hand, (1) both petitioner and her husband were large stockholders in the corporation; (2) they had saved the corporation's life when it was in danger of going bankrupt in 1927; (3) when petitioner's husband became president in 1940 he drew no salary for 1940 or 1941 and only a moderate salary for several years thereafter; (4) although the directors believed petitioner might require additional cash to assist her in maintaining *163 her scale of living, she was a woman of considerable wealth in her own right and could not be considered as being in actual need; (5) although Berlin & Jones had no formal pension plan it did in at least eight instances make payments of deferred compensation to departing officers or employees; [4] (6) the possibility that a preferential dividend was intended is not to be disregarded; [5] (7) it may be noted that the resolution labeled the payments to petitioner as a "pension"; [6] (8) Berlin & Jones claimed and has been allowed a deduction of $41,250 as an ordinary and necessary business expense; [7] and (9) since the decedent's death petitioner and her son in a very real sense controlled the corporation. *164 We think these latter criteria are more indicative of the transferor's intention than are the criteria favoring a gift. We think the combination of these latter criteria compel us to sustain the respondent's determination that the payments received by petitioner in 1957 and 1958 were income to petitioner under section 61 and not excludable gifts under section 102. From the basic facts set out in our findings the inferences that we draw are that the transferor's intention was to compensate Thomas Dickson for past services and we have so found as an ultimate fact. In any event, there was present no intention to make a gift. The payments in question did not proceed from a "'detached and disinterested generosity' * * * 'out of affection, respect, admiration, charity or like impulses,'" Commissioner v. Duberstein, supra, and do not qualify as gifts under the statute. On a case-by-case basis we think the facts in the following cases are quite similar to the facts in the instant case and clearly support the conclusion we have here reached. See Roy I. Martin, 36 T.C. 556, affd. 305 F. 2d 290 (C.A. 3, 1962); Smith v. Commissioner, 305 F. 2d 778 *165 (C.A. 3, 1962), certiorari denied 371 U.S. 904, affirming a Memorandum Opinion of this Court; Gaugler v. United States, 312 F. 2d 681 (C.A. 2, 1963); Cronheim's Estate v. Commissioner, 323 F. 2d 706 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court; and Lucile McCrea Evans, 39 T.C. 570, affirmed per curiam 330 F. 2d 518 (C.A. 6, 1964). We, therefore, sustain the respondent's determination. Decision will be entered for the respondent. Footnotes
1. In the stipulation this name is also spelled Hemmins and Hemmings.↩
2. SEC. 102. GIFTS AND INHERITANCES. (a) General Rule. - Gross income does not include the value of property acquired by gift * * *. ↩
3. SEC. 61. GROSS INCOME DEFINED (a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; * * *
(7) Dividends; * * *
(11) Pensions; * * *
(14) Income in respect of a decedent * * *↩
4. "It is not necessary that there be any formal statement or declaration of a plan in order for it to exist." Tomlinson v. Hine, 329 F. 2d 462 (C.A. 5, 1964), reversing and remanding Hine v. Tomlinson, 11 AFTR 2d 315↩ (D.C.Fla.).
5. Cf. Bacon v. United States, 12 AFTR 2d 6076↩ (D.C. Ky.).
6. Section 61, supra, lists pensions as one of the items of gross income. Of course the fact that the directors labeled the payments as a pension would not necessarily make then so, just as the resolution in Lucile McCrea Evans, 39 T.C. 570, 573, affd. 330 F. 2d 518↩ (C.A. 6, 1964), labeled payments to a widow "as gifts to provide her with financial assistance" it was nevertheelss held that the payments were income rather than gifts. 7. "The fact that the corporate payor claimed the present payment as a deduction in arriving at its taxable net income for the year in question is regarded as an intent to pay compensation for services rather than to make a gift." Willkie v. Commissioner, 127 F. 2d 953, 956↩ (C.A. 6, 1942), affirming a Memorandum Opinion of this Court.