Jane M. **FANNING** (Formerly Jane M. Husting), Appellee,

v.

Joseph J. **CONLEY, Jr.,** as District Director of Internal Revenue for the District of Connecticut, Appellant.

No. 166, Docket 29923.

United States Court of Appeals Second Circuit.

Argued Jan. 13, 1966.

Decided Feb. 11, 1966.

Lumbard, Chief Judge, dissented.

Thomas Silk, Jr., Atty., Dept. of Justice, Washington, D. C. (John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., Jon O. Newman, U. S. Atty. for Dist. of Connecticut, on the brief), for appellant.

John W. Roberts, Greenwich, Conn. (Ivey, Barnum & O'Mara, Robert C. Barnum, Jr., Greenwich, Conn., on the brief), for appellee.

Before LUMBARD, Chief Judge, and MEDINA and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge:

Once again in this post Commissioner v. Duberstein [1] era, we are called upon to review whether a corporate payment to the widow of a deceased employee is excludable from her gross income because it was a "gift." [2] After a trial solely on depositions and documentary evidence, Judge McLean found that the disputed disbursement had been prompted by motives of "generosity, admiration and respect" and thus constituted nontaxable income to the widow. For the reasons set forth below, we affirm.

The facts upon which this appeal is predicated are largely undisputed; but, typical of these cases, the inferences which flow from them are the subject of contention. Prior to July 1957,

2. Int.Rev.Code of 1954, § 102(a) provides:
   *General Rule.*—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.

1. 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1959).

Charles O. Husting was a director and vice-president of the Leo Burnett Company, Inc. ("Burnett"), a large advertising agency with principal offices in Chicago, Illinois. While the record does not reveal precisely how long Husting was associated with Burnett, it does appear that he was an "old-timer" in the company and that, without question, he held a position of considerable responsibility. His annual salary at the time of his death was $35,000 and, among other duties, he was in charge of maintaining and supervising Burnett's Procter & Gamble account. As a "key employee" Husting participated in Burnett's profit-sharing plan and was permitted to purchase a limited amount of the company's closely held common stock.[3]

Husting's last day of work was June 22, 1957; he was in his early fifties and in apparent good health. Shortly, thereafter, he entered Passavant Hospital in Chicago for surgery to remedy an undisclosed ailment. The day before his operation was scheduled to be performed, Husting spoke to one of his co-directors, William T. Young, Jr., who indicated that Husting was confident and in good spirits. Quite suddenly, Husting died the following day before the surgery had even commenced.

Less than three and a half weeks later, the Board of Directors of Burnett met to record its shock and bereavement at Husting's passing and to consider an appropriate corporate memorialization. The President of the company, Richard Heath, offered the following resolution which was unanimously adopted:

Be It Resolved that the Board of Directors of the Leo Burnett Company, Inc., officially record the passing on July 7, 1957 of Charles O. Husting, a fellow director, and pay tribute to his memory as follows:

"With deepest sorrow we mark the death of Charles O. Husting—friend, counsellor, major contributor to the progress of our company. Chuck was one of our 'old timers.' He will be remembered with affection and respect."

Be It Resolved by the Board of Directors of the Leo Burnett Company, Inc., that this corporation pay to Mrs. Jane Husting the sum of $17,500.00 as a salary continuation for her late husband Charles O. Husting in equal monthly installments beginning July 31, 1957, and ending December 31, 1958.

The District Judge's findings constitute a full exposition of the facts culled from the depositions and the documents which we have read with care. Before we discuss the legal contentions, it would be helpful to recite these findings. At the time Burnett resolved to make the $17,500 disbursement, Husting had been fully compensated and the corporation was not indebted nor obligated in any other fashion to Husting's widow. The sum of $17,500 voted by Burnett's Board was paid to Mrs. Husting[4] in monthly installments of $972.22 on drafts bearing the legend "Payroll Check" and drawn on the company's payroll bank account. These disbursements, however, were charged on its books to the "Miscellaneous Expense" account—not the "Payroll" account—and Burnett claimed tax deductions for these payments on its federal corporate tax return under the heading, "Other Deductions." Burnett, moreover, reported the payments to Mrs. Husting as "Annuities, Pensions and Other Fixed or Determinable Income" on its 1958 Form 1099 information return. The company never withheld for taxes any portion of the disbursements to Mrs. Husting.

3. Burnett is a non-public corporation capitalized by voting preferred stock all of which is held by Leo Burnett individually and by non-voting common stock which is owned by "key employees" and which

upon death or other severance from the company must be sold to the corporation.

4. The appellee, Mrs. Jane M. Fanning, will be referred to by her name when she was widowed—Husting.

In her returns, Mrs. Husting treated the $17,500 she received from Burnett as a gift and paid no tax upon it. However, the Commissioner, after exempting the first $5,000,[5] determined that the balance of $11,527.24[6] constituted income for the year 1958 and assessed a tax of $5,882.95 plus interest of $690.08. The taxpayer paid this deficiency under protest, demanded a refund, and subsequently commenced suit for its recovery.[7]

## I.

In affirming Judge McLean's holding that the payment of $17,500 to Mrs. Husting constituted a nontaxable gift, we approve not only the result but the factor-by-factor analysis he employed in reaching it.

Commissioner v. Duberstein, supra, although not altogether free from criticism,[8] continues as the touchstone for any decision in this area. And, we cannot ignore that while the government in *Duberstein* urged the Supreme Court to formulate a precise rule governing the income tax consequences of donative transfers, this suggestion was flatly rejected. Instead, the Court placed its imprimatur on an *ad hoc* determination in each case based upon the fact-finding tribunal's experience with "the mainsprings of human conduct as applied to the totality of the facts of each case" and the "close relationship of it to the data of practical human experience." In finding it neither feasible nor productive to set forth a clear "test" in the donative transfer area because "the governing principles are necessarily general," the Court comprehended that inconsistent determinations might well result from the

case-by-case approach it was advocating. We cannot gainsay that different fact-finding tribunals might not reach divergent results in similar factual settings when the controlling guidelines are so general. As illustrative, in order that the former employer's payment be construed as a "gift," we are told that it must stem from "detached and distinterested generosity" prompted by "affection, respect, charity or like impulses." But, since it is in the very nature of these cases that each will present a broad spectrum of factors and permutations, there is much pragmatic wisdom to the Supreme Court's decision to encourage the utilization of the *ad hoc* approach—based upon the trial judge's "practical human experience[s]"—at least until Congress chooses to clarify the standards to be applied in making Section 102 determinations.

*Duberstein* implicitly recognizes that nontaxable gifts can be made in commercial settings and can even serve some business purpose. The fact-finder is directed, however, to search out the "dominant reason" for the donative transfer and to disregard peripheral considerations. And, we are told that if the "dominant reason" is sufficiently divorced from its business background, a nontaxable gift results. See United States v. Kasynski, 284 F.2d 143 (10th Cir. 1960) and Poyner v. Commissioner, 301 F.2d 287 (4th Cir. 1962).

## II.

The government contends that the payment of the $17,500 to Mrs. Husting was too closely tied to the commercial setting which produced it and, therefore, constitutes taxable income to the widow. The

---

5. The first $5,000 Mrs. Husting received was exempted from income pursuant to Int.Rev.Code of 1954, § 101(b). It is significant that in 1962, the Commissioner abandoned the contention that § 101(b) modified § 102 and set $5,000 as a maximum limit upon the non-taxable amount a corporation could give to a beneficiary of a deceased employee. See Rev. Rul. 62–102, 1962–2 Cum.Bul. 37, modifying Rev.Rul. 60–326, 1960–2 Cum.Bul. 32.

6. The remainder of the $17,500 was paid to Mrs. Husting in 1959 and was not in issue before the District Court.

7. Jurisdiction was invoked pursuant to 28 U.S.C. § 1346(a) (1).

8. See Klein, "An Enigma in the Federal Income Tax: The Meaning of the Word 'Gift,'" 48 Minn.L.Rev. 215, 216–217 and articles cited in notes 12 and 15 (1963).

disbursement, it argues, was prompted primarily by Burnett's desire to raise morale and increase employee loyalty. We are of the view, however, that while it was likely that the company may have had mixed motivations in making the payment such as, for example, the beneficial effect upon its employees' *esprit de corps*, it does not follow that the District Judge could not have found, as he did, that the directors, deeply touched by Husting's sudden passing and out of a genuine concern for the welfare of his widow and children, were principally moved by a desire to be generous. Thus, William T. Young, Jr., Executive Vice President and a director of Burnett, stated that although company morale "might be of importance," it was not the "main consideration." Rather, it was a factor of "a supplemental kind." Young also observed that the gesture was not publicized and that $17,500 was minor when compared to the volume of earnings of the company: "The sum of money was not great. I think it was just done as an affectionate—as a considerate gesture. That is the only thing I ever thought of it." [9] Describing additional reasons for the payment, Young noted that "we certainly had a sympathetic feeling toward Mrs. Husting" and that the payment was "an act of fairness and generosity, being a considerate management."

Austin L. Wyman, Burnett's attorney and a director who knew Husting only professionally, also testified by deposition that the directors voted for the payment because "they all respected him [Husting] and liked him" and out of concern that his sudden death would leave his widow and children in a financially embarrassed condition as a result of the high standard of living to which they had become accustomed while the decedent had been alive. Richard N. Heath,

the President of Burnett, and the sponsor of the resolution that the company make the payment in issue, stressed that the disbursement had been approved in the light of Husting's "long and loyal association with the company" and that it was the "proper and right thing to do, the fair and decent thing to do." And William Tyler, also a director, stated that he voted in favor of the resolution to "ease the emotional burden" of Mrs. Husting's sudden loss. In light of this testimony, we cannot say Judge McLean did not have ample evidence in the record to support his finding that the payment to Mrs. Husting was predominantly motivated by genuine donative impulses and was sufficiently divorced from the peripheral business purposes it may also have served.

The government informs us, as it did Judge McLean, that between 1952 and 1964, twenty-one employees of the company had died and total payments in excess of $110,000 were made by Burnett to widows or other survivors of these deceased employees. We are asked to conclude from this history that either Husting or his spouse, or both, reasonably expected that Burnett would make a generous financial gesture at the time of Husting's death. But, this argument takes in too much in this case and glosses over several important features. See Estate of Olsen v. Commissioner, 302 F.2d 671 (8th Cir.), cert. denied, 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed.2d 165 (1962). First, Husting died in 1957, and, at that time, only five employees of Burnett had predeceased him. Consequently, even if it could be said that by 1964 Burnett had developed a practice or plan of making payments to the survivors of deceased employees, such a policy cannot be retroactively inferred to 1957. Indeed, Husting was the first Burnett director

---

9. The dual motivation of at least one of the directors in voting for the payment to Mrs. Husting is highlighted by other testimony of Young that the disbursement was made "Out of consideration for his [Husting's] services, and to be generous." Young also noted that he was "interested"

in protecting the company's position that the $17,500 payment constituted a deductible business expense. The District Judge did not overlook that the testimony of company executives may have been colored by their anxiety to sustain this deduction, nor can we ignore this factor.

and officer to die while the five other deceased employees held considerably lower echelon positions.[10] Moreover, only four of the five survivors of these employees received payments.[11] And at the time of Husting's passing, none of the directors knew how *all* previous employee deaths had been treated by the company; each knew of only one or two cases. Thus, in 1957, as one director put it, the payment to Mrs. Husting was not the product of established corporate policy and practice, but was instead, "an individual affair of a sudden death of a highly placed employee."

Much is made of the "salary continuation" language in the resolution authorizing the disbursement to Mrs. Husting and Burnett's deduction as a business expense;[12] it is urged, therefore, that no gift could have been intended. Our response to this is that in these income *vis-a-vis* gift cases, self-serving labels can be misleading and improperly motivated and therefore should not be the controlling or determinative factor. Poyner v. Commissioner, supra (description of payment as "a continuance of [decedent's] salary" not a bar to finding nontaxable gift). Estate of Kuntz v. Commissioner, 300 F.2d 849, 95 A.L.R. 2d 515 (6th Cir.), cert. denied, 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed.2d 165 (1962) (characterization of disbursement as "additional compensation and in consideration of services" does not control).

The focus, which the District Judge kept in sight as we have already indicated, was properly upon the principal motivation for making the payment as explicated by all the evidence.

We are also told that because of Mrs. Husting's alleged wealth, the directors could not have been motivated by generosity and the desire to have her retain her standard of living. See Tomlinson v. Hine, 329 F.2d 462 (5th Cir. 1964). But the depositions of the directors do not establish any knowledge of the amount Mr. Husting bequeathed to his widow. In fact, Wyman stated that the directors were prompted, in part, by concern that Husting failed to accumulate a substantial amount of wealth in view of his early death. And, Tyler acknowledged that although Mrs. Husting was not in immediate financial need at the time of her husband's passing, he did not believe that Husting had made her "independently secure for the rest of her days."[13]

### III.

Finally, we are unpersuaded by the government's contention that this case is controlled by our recent decision in Gaugler v. United States, 312 F.2d 681 (2d Cir. 1963), affirming the District Court's determination that the disbursement involved was not a gift within the meaning of Section 102. That case involved the payment by a large public corporation of $72,727.27 to the widow of its

---

10. For example, the five employees died between July 1952 and January 1956 and their salaries were $2,280, $4,200, $8,000, $22,500 and $7,200, respectively (as compared with Husting's $35,000), resulting in rather inconsequential payments to the survivors in four instances of $5,-625, $2,975, $2,266, and $1,151. Moreover, in at least one instance, and possibly a second, the corporation withheld the prescribed amount for income tax purposes.

11. No death payment was made in the case of one employee because although he ceased working in March 1955 his salary was paid to him until the end of that year. He died in January 1956.

12. The propriety of the corporation's tax deduction of the full $17,500 as a business

expense was not before the District Court and is not before us on this appeal.

13. The government also urges that the fact that the disbursement to Mrs. Husting totaled 50% of her husband's annual salary establishes that the directors were thinking in compensatory terms when they resolved to make this payment. We find this contention unconvincing. While the payment to Mrs. Husting may have been calculated on the basis of six months of her late husband's salary, it is significant that it was disbursed to her over a period of a year and a half. Moreover, in the case of the four employees who predeceased Husting and whose survivors received death benefits, disbursements were made in the same amount and at the same intervals as the decedent's salary had been paid.

deceased President pursuant to what one member of the Executive Committee described as the company's "practice in the event of the death of valued employees and officers with long service * * * to pay, for various lengths of time, their widows amounts equal to their salaries." While *Gaugler* may thus be distinguishable on its facts, it is not controlling in the instant case for another, even more compelling reason. The principal issue in *Gaugler*—as Judge Medina indicated in his opinion—was whether under the "clearly erroneous" standard, the District Judge had properly employed the factor-by-factor analysis which *Duberstein* required in Section 102 cases. It was under this restricted standard of review rather than upon a consideration of the facts presented that we affirmed the judgment below. In the instant case, however, because the record consists of depositions and other documentary evidence, we have scrutinized it perhaps more closely than required,[14] and have come to the independent conclusion that the able District Judge properly applied the *Duberstein* rationale and analysis and did not draw unreasonable inferences from the evidence.[15] Consequently, we find no basis for overturning his determination.

Affirmed.

LUMBARD, Chief Judge (dissenting):

I dissent.

In these often litigated gift versus salary cases, "(w)here the trial has been by a judge without a jury, the judge's findings must stand unless 'clearly erroneous.'" Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960); Gaugler v. Com-

missioner, 312 F.2d 681 (2 Cir. 1963). I feel that the decision of the lower court is clearly erroneous and must be reversed since, although there is some evidence to support the lower court, on the entire record I am left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Company, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

The majority bases its affirmance on the grounds that: (1) several Burnett directors stated that the payments were made as "an act of fairness and generosity," because it was the "proper and right thing to do" and to "ease the emotional burden" of Mrs. Husting's sudden loss, and (2) that there was no written or traditional policy of making such payments to deceased employees' families. Because these factors outweighed other elements in the case which they deem peripheral, the majority concludes that "the payment to Mrs. Husting was predominantly motivated by genuine donative impulses and was sufficiently divorced from the peripheral business purposes it may also have served."

The principal inquiry for determination by the district court was the "dominant reason" for the transfer from the employer to the employee's family. Commissioner v. Duberstein, 363 U.S. at 286, 80 S.Ct. 1190. But this does not mean that all the district judge need do is to utter the *Duberstein* words—"detached and disinterested generosity" and "out of affection, respect, admiration, charity or like impulse," 363 U.S. at 285, 80 S.Ct. at 1197—and that we are bound to affirm if he makes obeisance to those words.

Young, one of the directors, stated that in the advertising business, "our main

---

14. But see, Miller v. Commissioner, 327 F.2d 846 (2d Cir. 1964).

15. Whether the "clearly erroneous" doctrine is applicable despite the trial on depositions is of little importance in this case because we did not restrict our affirmance to that ground. In any event, Justice Brennan's language in *Duberstein* on this score is enlightening: "One con-

sequence of this is that appellate review of determinations in this field must be quite restricted." 363 U.S. at 290, 80 S.Ct. at 1199. And, "[t]he rule itself applies also to factual inferences from undisputed basic facts * * *, as will on many occasions be presented in this area." Id. at 291, 80 S.Ct. at 1200.

equity is people" and that skilled people, who are in great demand, are attracted to a company in part, "because of fringe benefits introduced into the business." Heath, another director, said that the company derives "a big" benefit from this kind of payment and "there is nothing more important than the morale value" to the employees. Similar feelings were voiced by Wyman, and another director, Tyler, who said, in response to the question, "What benefit accrued to the company from this payment?," "A feeling increased more really from other employees who felt that should the same circumstances befall them, that the company would show some personal interest in their widow or family."

From 1952 through 1964, payments of approximately $110,000 were made to the families or relatives of deceased Burnett employees. Although Husting was the first officer to die, the fact that payments had been made to the families of five[1] employees who predeceased Husting is strong evidence to support a finding that there had developed a conscious plan by Burnett to make these payments on a regular basis to all employees. I fail to see why the fact that payments to the families of only five employees who predeceased Husting negates the existence of a plan, especially because the directors testified that Burnett was a young company and that deaths were only starting to occur regularly in the Burnett staff. Does such a plan begin after six cases, or ten, or how many?

While not per se decisive, I am also influenced by the fact that Burnett took a tax deduction for the payments to Mrs. Husting, by the fact that the payments were called "salary continuation" and by the fact that the payments equalled exactly one-half of Husting's annual salary. If on this record the district court is left free to call the payment to Mrs. Husting a gift, it is difficult to imagine just what kind of payment could not be treated as a gift.

In sum, I fail to see how the lower court could have concluded that the *"dominant* purpose" of the transfer was donative. Since I feel it was clearly erroneous so to hold, I vote to reverse and to enter judgment for the Commissioner.

---

1. See footnote 11 in majority opinion.