**Annette POMERANCE, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 70 C 472.**

United States District Court, E. D. New York.

July 27, 1972.

Norman D. Levy, New York City (Irving L. Spanier, New York City, and Alex

M. Hamburg, New York City, of counsel), for plaintiff.

Robert J. Hipple, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Donald R. Anderson, Atty., Dept. of Justice, Robert A. Morse, U. S. Atty., of counsel), for defendant.

## MEMORANDUM INCORPORATING FINDINGS of FACT and ORDER

DOOLING, District Judge.

Plaintiff, the widow of Hy Pomerance, who died on December 21, 1958, sues to recover income taxes of the years 1959, 1960 and 1961 which she paid in respect of amounts received by her in those years from Styl-Rite Optics, Inc., the corporation of which her deceased husband had been president, and in which he had been the moving spirit. Plaintiff received $35,000 in 1959, of which $30,000 was treated by defendant as taxable income; she received $15,000 in 1960, all of which was treated as taxable income; and she received $6,900 in 1961, all of which was treated as taxable income. Timely claims for refund were filed and disallowed. The present action followed. It was stipulated that the case was to be tried by jury, but later, at the time of trial, both sides agreed to proceed without jury.

In the last years of Hy Pomerance's life his salary with Styl-Rite was at the rate of $50,000 a year. Associated with him in the management of the company were his brothers Sam and Manny Pomerance. The three brothers were officers and directors of the corporation. The corporation's accountants were Henry Brout & Company.

Hy Pomerance was 48 years old when he died of a heart ailment, after some earlier heart problems from which he had apparently recovered.

Early in the year 1958 the three brothers had commenced to talk, at Hy Pomerance's instance, about setting up some kind of pension plan for valued employees. While it is referred to constantly as a "pension plan" it appears that from the earliest discussions the plan was expected also to incorporate some sort of *post mortem* payments. Henry Brout testified that the general idea was that they ought to pay the widow of a valued employee about a year's salary in the form of a compensation in contemplation of the decedent's past service to the corporation. While there is a possible confusion, and Mr. Brout's testimony could easily be interpreted as having dealt solely with *post mortem* payments to valued employees' widows, the testimony of Manny Pomerance was throughout in terms of pension planning with death benefits an element in the complete planning. It emerges clearly enough that in 1958 before Hy Pomerance's death there was genuine discussion about setting up a pension plan and having *post mortem* payments to valued employees' widows, that the principals in the corporation had made up their minds to follow that course, and that they had discussed it with persons outside the company, such as Henry Brout, but had not formulated a definitive plan or actually commenced work on implementing the determination. General ideas of the range of payments had been formulated, but it cannot be, and is not, found that the "formula" had arrived at precision.

Some time after Hy Pomerance's death the surviving brothers as corporate managers decided to pay Mrs. Pomerance, the plaintiff, about $35,000 for the calendar year 1959. Mrs. Pomerance was not in need. Manny Pomerance understood that she had been well-provided for by her deceased husband. The payments to her were not to relieve a condition of indigence or necessity; they were not compassionate payments. The payments of each year were made in periodical checks.

Mrs. Pomerance came to the Styl-Rite office for some months after her husband's death, and did a certain amount of undefined office work, but it is not suggested that she earned the $35,000 paid her during 1959 or that there was any connection between the work that she did and the amounts that she received.

Hy Pomerance was paid all that was owed to him as an officer of the corporation for services that he rendered to it up through the date of his death. Neither he nor his estate had any legal right to make any further claim upon Styl-Rite for additional compensation.

No earlier payments to the widow or other survivors of key men in the corporation had ever been made. However, there was no evidence that there had ever been a "key man" death before the death of Hy Pomerance.

On September 16, 1959, and apparently some very considerable time after the payments to Mrs. Pomerance had commenced, at a joint meeting of the directors and stockholders of Styl-Rite at which the estate of Hy Pomerance was represented by its executor, a new president was elected. He called to the attention of the meeting that the officers had granted to Hy Pomerance's widow "a pension in the amount of $35,000. for the year commencing January 1st, 1959." That course of action is recited in the minutes as having been unanimously approved and ratified by the stockholders and directors. On the minutes is pencilled at the end of the quoted sentence words which appear to read "and 15,000 for the year beginning Jan. 1, 1960."

At a joint meeting of stockholders and directors held just a year later, on September 16, 1960, at which Mrs. Pomerance was present as a director and as representing, along with Sam Pomerance, her husband's estate, it was stated by the chairman of the meeting that "the officers of the corporation granted to the widow of the late Hy Pomerance a pension in the sum of $15,000. for the calendar year 1960." This course of action was recited in the minutes as unanimously approved and ratified by the stockholders and directors.

After Hy Pomerance's death work was done on the preparation of a pension plan, but not until after September 16, 1959 was it completed, and an agreement for a pension plan signed. The formal action of the directors authorizing the putting into effect of the pension plan came on September 25, 1959, about nine days after the joint stockholder-director meeting at which the 1959 payment of $35,000 to Mrs. Pomerance was ratified.

It has been testified that the payments made to Mrs. Pomerance in aggregate would not differ very greatly from the amount that would have been received as a death benefit had the plan as finally adopted been put into effect before Hy Pomerance died. The aggregate of the payments to Mrs. Pomerance was either $56,900 as indicated in her returns of income tax, or $56,413.90, as apparently reflected in the returns of tax of the corporation. Under the Pension Trust Provisions as that instrument was adopted in 1959 Hy Pomerance's "pension" would have been about $6,960 a year, and he would have been entitled, if insurable, to an insured death benefit equal to a hundred times his monthly pension, which would have been a life insurance coverage of about $58,000.

It appeared also that the life of Hy Pomerance was insured in the corporation's favor in the amount of $100,000.00.

In the United States income tax return of Styl-Rite for its fiscal year ending September 30, 1959, Styl-Rite deducted the part of the $35,000 paid through September 30, 1959, as "pensions" along with other expense deductions. Similarly in the year ending September 30, 1960, $20,000 was deducted as an expense deduction under the description "pensions." And in the year ending September 30, 1961, $10,163.90 was deducted on the same account.

The tax advisers of Styl-Rite wished plaintiff to report the $35,000 paid to her during the calendar year 1959 as income, but her counsel objected to that course and accordingly it was not returned as income, but was listed as follows:

"NON-TAXABLE INCOME

Taxpayer received $35,000.00 from Styl Rite Optics, Inc. due to the

death of her husband who was an officer of that corporation."

Mrs. Pomerance, however, apparently by reason of the intervening decision in Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218, returned the payments received as taxable income in 1960 and 1961, identifying the payments as "OTHER INCOME" from "other sources" with the statement "payment from employer of husband-deceased" in 1960, and in 1961 with the statement "payment rec'd from employer of dec'd husband."

Commencing in 1966 and 1967 the Internal Revenue Service challenged the 1960 and 1961 deductions of the "pension" amounts by Styl-Rite, and Styl-Rite protested that the

". . . payments were compensatory in nature, and primarily motivated by business reasons. The considerations involved were as follows:

"1. The valuable past services to the corporation of Hy Pomerance, who was instrumental in the growth of the corporation's business, and

"2. The formulation of a general policy to provide payments to widows of employees. This policy was realized within a year of the death of Hy Pomerance, when the corporation adopted a Pension Plan which provided for substantial death benefits for survivors of covered employees. This Plan went into effect on September 25, 1959 . . . .

"The above payments were not gifts; (1) Nothing in the corporate minutes or corporate records expresses any donative intent with regard to these payments. (2) The officers and directors of the corporation considered that the former President, Hy Pomerance, had left his widow and family adequately provided for and therefore were not motivated by any substantial concern regarding the future or immediate financial welfare of the family."

A deficiency was assessed against the corporation for both taxable years and

the corporation petitioned for a re-determination, asserting that Hy Pomerance rendered long and valuable service as an employee of the Petitioner, that the Petitioner made the payments pursuant to a plan to provide the death benefit payments to widows or other beneficiaries of covered employees as compensation for the valuable past services of these employees and that the plan was adopted to provide an incentive to employees to continue in corporate employment and to improve employee morale and, in consequence, performance of duties. It was asserted further that payments had been reasonable in amount and were ordinary and necessary business expenses of the years in question.

The petition was filed in June of 1968, and in January of 1970 Manny Pomerance furnished an affidavit, which was supported by the concurring affidavit of Henry Brout, in which it was asserted that informal discussions were held before Hy Pomerance's death with the firm's professional advisers, and that it had been agreed to adopt an employee's benefit plan to meet the qualifications of the Internal Revenue Code and to provide retirement and death benefits for officers and employees who were not participants in the plan covering union employees. The affidavit asserted that the consideration for instituting the plan was that it would improve the morale of the employees and offer them an incentive to continue with the corporation. It was further said that after Hy Pomerance's death the directors and stockholders adopted resolutions granting his widow a widow's "pension" and that payments were accordingly made to her by the corporation and that "such payments were intended to be in lieu of the death benefits which would have been payable to the widow of Hy Pomerance had the employee benefit plan for officers and non-union employees been formally implemented;" and that within ten months after Hy Pomerance's death the plan was formally adopted and was approved as a qualified plan by the Internal Revenue Service. It was said

that the plan so adopted covered both retirement pension and death benefit. It was asserted that under the plan the widow of Hy Pomerance would have received about the same as was paid to her as a widow's pension. It was then again asserted that "the payment of a widow's pension to Annette Pomerance was part of an over-all plan to provide death benefits as well as other employee benefits to the officers and employees of the corporation;" it is also said that the payment was "intended as recognition and compensation for the past valuable services of Hy Pomerance;" and was "deemed necessary by the Board of Directors in order to maintain the morale of the employees;" and that the Board in adopting resolutions covering the payments "did not have the intent of making a gift" to Mrs. Pomerance, and that the directors were not concerned about Mrs. Pomerance's financial condition, since they had good reason to believe that Hy Pomerance had left her adequately provided for.

Mrs. Pomerance did not testify nor did Sam Pomerance. The witnesses were Manny Pomerance and Henry Brout. The corporate intention, necessarily somewhat complex and reflected in the determinations of the two principal executives and directors who were brothers of the deceased president, was not in the conventional sense of the word a donative intention. The payment was without a sufficient common law consideration. Nothing was "due" to Hy Pomerance for services already rendered and paid for. Nor was the payment motivated by a perception of need on the part of Hy Pomerance's widow. In other words it was not a payment that was regarded as due in any contractual sense nor one that was required in order to relieve the widow's lot and prevent disaffection on the part of employees who might see a widow left unprovided for. But the payments were in the minds of the surviving brothers and, consequently, in the purpose of the corporation, made with the sense that something was properly to be paid by reason of the magnitude of Hy Pomerance's past services to the corporation, something over and above and beyond what was his due for his work to the date of death, and that to pay it would be to give effect to what would have been Hy Pomerance's entitlement for himself and his widow if the pension and benefit plan, which was already under active discussion and had become the beginnings of a program before Hy Pomerance's death, actually had been put into effect before Hy Pomerance died. No more than this can be said and no less may be said.

The question then is, What is the legal classification for income tax purposes of the payments made?

The standards approved in Estate of Carter v. Commissioner of Internal Revenue, 2d Cir. 1971, 453 F.2d 61, 64, drawn from Estate of Hellstrom, 1955, 24 T.C. 916, require a judgment for plaintiff. The payment was made to the widow not to her husband or his estate; there was no obligation on Styl-Rite to make any further payment to the widow or to her late husband's estate; the widow was not a former corporate employee; the corporation was not economically benefitted, for any "morale" value of the payment to the corporation is not in the circumstances credible, and, on the contrary, is negated by Manny Pomerance's testimony that the payments were not generally known to the employees; and the deceased had been paid in full for his services. Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 285, 80 S.Ct. 1190, 4 L.Ed.2d 1218, itself is clear enough that "business overtones," and they permeated the gift of the Cadillac to Duberstein dealt with in that case, do not mean that transfers in appreciation of past services usually compensated and paid for (or, as in *Duberstein* gratuitously rendered without expectation of reward) require a finding that the gift exclusion is inapplicable, and that remains true even if the payor corporation claims a deduction, 363 U.S. at 285, 288, 80 S.Ct. 1190; impliedly the Court rejected any interpretation of Bogardus v. Commissioner of Internal

Revenue, 1937, 302 U.S. 34, 39–40, 58 S.Ct. 61, 82 L.Ed. 32, as intimating that the mutual exclusivity of the statutory exclusion of gifts and the statutory inclusion of compensation for services in gross income also precludes the same transfer amounts being both an excluded gift and an expense-deductible payment of compensation.

There is much here to emphasize that the corporation repeatedly said and still insists that it intended no gift but only an additional reward for past services, and that there was no element of the compassionate in the payments, since the widow was not in want, but only the initiation, by anticipation, of what soon became a regular plan. But corporate payments to executives' widows who have no legal or customary claim on the corporation are overwhelmingly alike in those bare but critical parameters—that they are corporate payments, are made to executives' widows, and are, legally, voluntary or gratuitous payments; the rest is makeweight. The corporate mind here consisted in the minds of the decedents' two brothers who appreciated what the decedent had accomplished. They intended to make a payment to the widow that neither they nor the corporation were bound to make. To say that it was made as a species of retroactive payment under the plan adopted after Hy Pomerance's death pursuant to discussions that preceded his death emphasizes that it cannot be said that Hy Pomerance rendered his service in the expectation that if he died his widow would receive such a payment. The significance of the existence of a custom or practice of making such payments is that, if known to the employees, it becomes a term of their hire, even if in a dilute sense; when paid, it fulfills an expectation if it does not, strictly, discharge an obligation. *Cf.* Fanning v. Conley, 2d Cir. 1966, 357 F.2d 37.

It is believed that there is no controversy over the computation of tax. It may be that counsel should agree on the interest calculation so that it can be furnished to the Clerk.

It is

Ordered that plaintiff is entitled to judgment as prayed and, upon the furnishing of the calculations to the Clerk, it is further

Ordered that the Clerk enter judgment that the plaintiff recover of the defendant the amount of the taxes with interest to the date of judgment.