**Jane M. FANNING (formerly Jane M. Husting), Plaintiff,**

**v.**

**Joseph J. CONLEY, Jr., as District Director of Internal Revenue for the District of Connecticut, Defendant.**

Civ. No. 9212.

United States District Court
D. Connecticut.

May 3, 1965.

John W. Roberts, of Ivey, Barnum & O'Mara, Greenwich, Conn., for plaintiff.

Jon O. Newman, U. S. Atty., Hartford, Conn., Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston, David A. Wilson, Jr., Daniel J. Dinan, Department of Justice, Washington, D. C., for defendant.

McLEAN, District Judge.*

This is an action to recover income taxes for the year 1958 in the sum of $5,882.95 plus interest thereon of $690.-08, making a total of $6,573.03, which plaintiff paid pursuant to a deficiency assessment which she claims was erroneously made by defendant. The taxes were assessed upon money paid to plaintiff by Leo Burnett Company, Inc. ("Burnett") the employer of her late husband, Charles O. Husting, subsequent to his death. The payments were made in 1957, 1958 and January 1959. Only those made in 1958 are involved in this action.[1]

Jurisdiction is based upon 28 U.S.C. § 1346(a) (1).

All the testimony is in the form of depositions. The case was submitted to the Court upon the depositions and the documentary exhibits. One of the depositions, that of Clifford H. Irwin, Assistant Secretary of Burnett, was stricken as incompetent and irrelevant by Judge Anderson at pre-trial, except for so much of it as quotes a resolution of the Board of Directors of Burnett. I will adhere to that ruling. Most of the testimony in this deposition, in any event, merely duplicates the testimony of other witnesses, except for a letter dated October

---

* Sitting by designation.

1. Defendant treated the first $5,000.00 of these payments as exempt under Section 101(b) of the Internal Revenue Code of 1954 (26 U.S.C. § 101(b)). Since the payments in 1957 amounted to only $4,-861.10 no deficiency was assessed for that year.

2, 1958 from Irwin to plaintiff's attorney in which Irwin attempted to characterize the payments to plaintiff. Since Irwin was not a director of Burnett and had no part in the decision to pay this money, his views as to the intention of the Board of Directors in voting the payment are inadmissible.

The question is whether the payments to plaintiff were a gift within the meaning of Section 102(a) of the Internal Revenue Code of 1954 (26 U.S.C. § 102 (a)) which excludes from gross income the value of property acquired by gift. I find the relevant facts to be as follows.

Burnett is an advertising agency, with its principal office in Chicago, Illinois. Its stock is not publicly held. All the preferred stock, which alone has voting rights, is owned by Leo Burnett individually. The non-voting common is held by certain key employees.

Husting was a vice-president and a director of Burnett. His salary was $35,000 per year. He died suddenly, in his early 50's, on July 7, 1957.

On July 29, 1957 Burnett's Board of Directors met and upon the recommendation of the president unanimously adopted the following resolutions:

*"BE IT RESOLVED* that the Board of Directors of the Leo Burnett Company, Inc., officially record the passing on July 7, 1957, of Charles O. Husting, a fellow director, and pay tribute to his memory as follows:

'With deepest sorrow we mark the death of Charles O. Husting—friend, counsellor, major contributor to the progress of our company. Chuck was one of our "old-timers." He will be remembered with affection and respect.'

*BE IT RESOLVED* by the Board of Directors of the Leo Burnett Company, Inc., that this corporation pay to Mrs. Jane Husting the sum of $17,500.00 as a salary continuation for her late husband Charles O. Husting in equal monthly installments beginning July 31, 1957, and ending December 31, 1958."

Burnett was not indebted to Husting at the time of his death. Husting had been paid in full for his services.[2] Burnett was not indebted to Mrs. Husting and was under no obligation to pay her anything.

The $17,500 voted by the directors by the foregoing resolution was paid by Burnett to plaintiff over a period of a year and a half, in monthly installments of $972.22 beginning in August 1957 and ending in January 1959. Burnett paid the full $17,500 to plaintiff. It withheld nothing for income taxes or other deductions. The payments were made by checks on Burnett's payroll bank account. The checks bore the printed legend "Payroll Check". The payments, however, were not charged to payroll on the Company's books. They were charged to an account entitled "Miscellaneous Expenses". Burnett took a deduction for these payments on its own federal income tax return, including them in an item headed "Other Deductions". Burnett filed an information return on Form 1099 for 1958 reporting the payments to plaintiff in that year under the heading "Annuities, Pensions and Other Fixed or Determinable Income".

Plaintiff treated the payments as a gift. She did not report them in her 1958 income tax return.

The federal estate tax return of the Estate of Charles O. Husting, of which plaintiff was executrix, did not include the $17,500 in the decedent's estate. The characterization of this sum in Schedule F of the return as a "gratuity and gesture of good will" is obviously self-serving and incompetent and will be disregarded.

---

2. Husting died on the 7th day of July, but anything that could be said to be owing to him for those seven days is *de minimis* and did not enter into the consideration of the directors. Moreover, since Husting's last day of work was June 28, it would seem that in any case he had no legal claim to compensation beyond that date.

The estate tax return reports a total gross estate of $385,265.18 and a net taxable estate of $112,197.17. The return was prepared and filed long after July 29, 1957 and it is clear that the directors of Burnett on that day did not know its contents. The return is thus irrelevant upon the question of the directors' knowledge and intention.

It is also clear from the testimony that the directors had no precise or complete information as to Husting's financial worth or that of his widow. They were aware in a general way that Husting's estate would be entitled to certain benefits under the Company's profit sharing plan and that it would receive the proceeds of the sale of whatever Burnett stock Husting owned. The terms of the employees stock purchase plan required that the stock be resold to the Corporation upon the employee's death. One director testified that he knew that Husting had left life insurance of some $70,000. There is no evidence that the other directors were aware of this.

Four directors testified as to what occurred at the Board meeting of July 29, 1957. Although the witnesses varied markedly in articulateness, the testimony of all four is substantially the same, and out of all this testimony a reasonably consistent picture emerges. I find that the reasons which led the Board to adopt the resolutions of July 29, 1957 were as follows:

The directors were shocked at Husting's sudden death. They liked him personally and they believed that he had been a loyal and valuable employee of the Company. They also liked his widow and felt sorry for her. They wanted to do something for her in order, as one of them put it, to "ease the emotional burden" of her loss. They knew that she was by no means destitute, but they had no accurate knowledge of her financial condition and in any case they believed that whatever her assets might be, the death of her husband would inevitably curtail her income. Therefore as a tangible manifestation of their respect and affection for Husting and their desire to be of help to his widow they voted to pay her $17,500. They were perfectly aware of the fact that there was no legal obligation to Mrs. Husting. Moreover they did not consider that the Corporation had any moral obligation. They did not think in terms of obligations, but rather in terms of generosity.

The $17,500 amount was arbitrary. It was a sum equal to one-half of Husting's annual salary. This seemed to them to be an appropriate figure. No doubt they believed that it would be more helpful to Mrs. Husting to spread this out over a year and a half than to pay it in a lump sum or over a period of six months.

As in many human decisions, the motives that prompted this decision were not wholly unmixed. The directors considered it good business management to be generous to the survivor of a deceased employee because this would have a helpful effect on the morale of other employees. The directors were concerned with the attitude of the employees toward the Company because in the advertising business more than in some other businesses the Company's principal asset is the talent of those who work for it. The Board did not direct that the Company's employees be advised specifically of what the Board had decided to do for Mrs. Husting, but it seems safe to assume that they believed that the news would eventually get around.

This desire on the part of the directors that the Corporation receive credit, so to speak, in the eyes of its employees for its generous act was, as one director put it, a "supplemental consideration". The primary objective was to help Husting's widow for the reasons that I have summarized.

Before Husting's death only five other employees had died while in the Company's service. Their dates of death fell between July 2, 1952 and January 19, 1956. The question of what to do for their survivors was considered by the Board of Directors in each instance as a separate case. None of these em-

ployees had been an officer or director of the Corporation, as Husting was. None had been as valuable to the Company. The nearest from this point of view had been Sattley, a copy writer who, at his death, had a salary of $22,500. The annual salaries of the four others were $8,000, $7,200, $4,200 and $2,280. In four of these five earlier cases Burnett continued to pay the decedent's salary to his surviving wife or mother until December 31 of the year in which he died. This resulted in a total payment of $5,625 in Sattley's case and somewhat smaller payments in the others, i. e. $2,975, $2,666 and $1,151. In the fifth case the directors did not make a similar provision. This employee Aby, died on January 19, 1956. His salary stopped on December 31, 1955. There was no payment to his survivors after his death.[3]

In each of the cases prior to Husting the payments to the survivor were charged on the Company's books to payroll, not to miscellaneous expense, as Husting's was. In at least one case, that of Pape, the Corporation withheld from the payments the prescribed amount for the employee's income taxes, and this appears to have been done also in Sattley's case although the testimony is not entirely clear on this. It does not appear what the Corporation did in this respect with regard to the other two.

The directors testified that on July 29, 1957 there was no established Company policy or practice with respect to payment to the survivors of deceased employees and that in approving the payment to plaintiff they were dealing with a particular case, not carrying out a pre-existing policy. The evidence heretofore summarized with respect to the earlier cases is not so inconsistent with this testimony as to require me to disbelieve it. Some of the directors were aware of certain of these prior instances, but it does not appear that any director was aware of all of them, or that these

prior cases were mentioned at the Board meeting of July 29, 1957. I find as a fact that there was no such established policy or practice on July 29, 1957 or prior thereto. There could have been no such established practice with respect to deceased officers and directors, since Husting was the first officer or director to die.

The evidence shows that subsequent to July 29, 1957, and between that date and the present, sixteen other employees, including at least one officer, have died, and payments have been made subsequent to their death to their survivors. The first such death did not occur until over two years after Husting's death. In all but three of these cases the payments were in lump sums rather than in installments. Perhaps it could be said that by now the Company has an established practice in this respect. But what the Corporation did from September 1959 to date is not relevant to the question of whether a policy had been established before July 1957, nor is it relevant to the question of what the directors intended when they adopted the resolution of July 29, 1957.

It will be noted that in the four instances prior to Husting's death in which Burnett made payments to the survivor of a deceased employee, the payments were in monthly amounts equal to what the employee's salary check had been before his death. Doubtless it was because of this that the Corporation referred to these payments as a "continuation of salary" and no doubt it was because of this label that the payments in these cases were made on payroll checks and charged to the payroll account. I believe that this explains the wording of the Husting resolution which also characterized the $17,500 as a "salary continuation". It also explains why the payments were made on payroll checks. Indeed, the Company's accountant said as much. He testified that the installments

---

3. The Corporation, however, did pay Aby's salary directly to Aby until December 31, 1955, although he had ceased to work, due to his illness, on March 25, 1955.

were paid out of the payroll bank account because they were considered to be "salary continuation payments".

This label is inaccurate. The payments were not in fact payments of salary. Husting was not entitled to any salary since he had been fully paid for his services. His widow was not entitled to salary. She was not employed by the Corporation and performed no service for it. The phrase is a layman's shorthand way of describing a sum equivalent to salary. Even when so viewed the phrase is not strictly accurate in Husting's case, although it was in the earlier cases, because the monthly payments to Mrs. Husting were not in fact the same as the monthly pay check that Husting had received in his lifetime.

The only respect in which the sum voted to Mrs. Husting could be said to bear any relation whatever to salary was the fact that the total sum was equal to one-half of Husting's annual salary at the time of his death. While this probably explains why the directors chose the figure of $17,500, it does not follow that this sum was salary in any legal sense. The directors surely must have so understood. Although the use of the phrase "continuation of salary" in the resolution is a factor to be considered, I do not regard it as determinative.

On these facts, were these sums paid by Burnett to Mrs. Husting in 1958 a gift within the meaning of the statute? The statute does not define the word. The Supreme Court, however, in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L. Ed.2d 1218 (1959), has laid down the guiding principles, which may be summarized as follows.

■■■ The mere absence of any consideration for the transfer does not necessarily make the transfer a gift within the meaning of the statute. Nor does the mere absence of a legal or moral obligation to make the transfer require the conclusion that it is a gift. The critical question is the transferror's intention. This means that the Court must ascertain what the transferror's reason was for making the payment. Since the transferror may have had more than one reason, it is the basic or dominant reason that controls.

■■■ It is a gift, in the statutory sense, if the transfer "proceeds from a 'detached and disinterested generosity,'" or if it is made "'out of affection, respect, admiration, charity or like impulses.'" (363 U.S. at 285, 80 S.Ct. at 1197). In order to determine whether the transfer meets this test the trial Court is to consider all relevant factors in the light of the Court's experience with human conduct. No one factor is conclusive. Specifically, the tax treatment given to the payments by the transferror is not determinative. It is a matter of weighing and balancing, a matter of judgment.

Defendant places his main reliance upon Gaugler v. United States, 312 F.2d 681 (2d Cir. 1963), in which the Court of Appeals affirmed a decision of Judge Levet holding that payments made by a corporation to the widow of its late president were not a gift (Gaugler v. United States, 204 F.Supp. 493 (S.D.N.Y.1962)). The Court of Appeals affirmed on the ground that the question was one of fact, that Judge Levet considered all the relevant factors bearing upon that question, and that on the evidence it could not be said that his finding of fact was clearly erroneous. The facts in the case were similar in some respects to those of the case before me. In some respects they were different, notably in the existence there of a previous policy and practice which was specifically considered and followed by the directors in approving the payment in question.

It is unnecessary for me to consider whether I would have reached the same conclusion as Judge Levet upon the facts of the case before him. Decision in each of these cases rests not only upon the facts of the particular case, but also upon the relative weight which the court, in the exercise of its judgment, gives to the various factors. For that reason decisions in other cases are of comparative-

ly little value. For completeness' sake, mention may be made of the following decisions which, since Duberstein, have held the payments to constitute a gift. United States v. Kasynski, 284 F.2d 143 (10th Cir. 1960); United States v. Frankel, 302 F.2d 666 (8th Cir. 1962), cert. denied 371 U.S. 903, 83 S.Ct. 208, 9 L. Ed.2d 165 (1962); Olsen's Estate v. C. I. R., 302 F.2d 671 (8th Cir. 1962), cert. denied 371 U.S. 903, 83 S.Ct. 208, 9 L. Ed.2d 165 (1962); Rice v. United States, 197 F.Supp. 223 (E.D.Wis.1961).

Cases which have reached a contrary result are: Froehlinger v. United States, 217 F.Supp. 13 (D.Md.1963), aff'd, 331 F.2d 849 (4th Cir. 1964); McCarthy v. United States, 232 F.Supp. 605 (D.Mass. 1964).

█ I have considered and weighed all the relevant factors heretofore summarized, which include all those which the Supreme Court and the Court of Appeals (Gaugler v. United States, 312 F.2d at 684) have directed the District Courts to consider. It is my best judgment, upon all the evidence, that the basic and dominant reasons which caused Burnett's Board of Directors to authorize the payments to plaintiff were reasons of generosity, admiration and respect. It follows that the payments were a gift, within the meaning of 26 U.S.C. § 102 (a). I find and conclude that they were. It further necessarily follows that the payments were not includable within the gross income of plaintiff for 1958, that the deficiency was erroneously assessed and that plaintiff is entitled to recover the tax plus interest. I so find and conclude.

Whether these payments were properly deductible by Burnett on its own income tax return is a question that is not before me and I express no opinion concerning it.

Pursuant to Rule 52(a), this opinion constitutes the Court's findings of fact and conclusions of law.

The Clerk is directed to enter judgment in favor of plaintiff in the sum of $6,573.03 with interest thereon at the rate of 6% from April 21, 1961.

So ordered.

