Pauline F. Paschkes v. Commissioner.
Paschkes v. Comm'r
Docket No. 4808-65.
United States Tax Court
T.C. Memo 1969-256; 1969 Tax Ct. Memo LEXIS 39; 28 T.C.M. (CCH) 1318; T.C.M. (RIA) 69256; December 2, 1969, Filed. *39 Petitioner, the widow of the former president of Astron Corporation, received funds from Astron for a limited period of time after her husband's death. The payments were made pursuant to two resolutions of the board of directors. Upon all of the evidence, it is held that the dominant reason for the resolutions and the payments was a genuine, detached, disinterested, donative desire to do something for petitioner during the period of adjustment following her husband's death; that business reasons and purposes were not the predominant motive; Astron did not receive any real benefit; and the payments were nontaxable gifts. David J. Feigert, 22 W. 1st St., Mt. Vernon, N. Y., for the petitiner. Agatha L. Vorsanger, for the respondent. HARRON Memorandum Findings of Fact and Opinion *40 HARRON, Judge: The respondent determined deficiencies in income tax for 1956, 1957, and 1958 in the respective amounts of $9,086.16, $6,460.91, and $1,615.76. The issue is whether the amount received in each year from the corporation which employed petitioner's deceased husband is a nontaxable gift excludable from gross income under section 102(a) of the Code, or is taxable income under section 61(a)(1), as respondent determined. Findings of Fact The oral and written stipulated facts are so found and are incorporated herein by reference. Petitioner is a resident of Mount Vernon, N. Y., where she resided when the petition was filed. She filed individual income *41 tax returns for the taxable years with the district director of internal revenue for the Manhattan District of New York City. Petitioner is the widow of Otto Paschkes who died on October 25, 1955, a resident of Mount Vernon, N. Y., at the age of 70 years. He was the president of Astron Corporation. After her husband's death, Astron made periodic payments to petitioner during the years 1955-1958. The payments made in 1956-1958 are in dispute here. The year 1955 is not before us. Astron Corporation was a New Jersey corporation, organized in September 1949, which had its offices and plant in Newark, N.J. It became merged into Renwell Industries, Inc., in 1962. It was engaged in the business of manufacturing and selling fixed capacitors and noise suppression filters. A capacitor, or condenser, controls electric circuit performance, stabilizes electronic circuits, and is an essential component in electronic products. Noise suppression filters 1319 suppress undesirable noises in electronic devices and various types of electrical equipment. Astron's products were used in many kinds of electronic, electrical, and communication devices and equipment. Astron sold some of its products *42 to the United States Government for use in military equipment. Astron maintained an engineering and research department. Technological skills were required in developing and producing Astron's products. Its business was in the highly competitive electronics industry. Otto Paschkes joined the Astron organization early in 1950, and became its president and a director in May 1950. He held those offices continuously up to the time of his death. Astron owed much of its success to Otto. Before working for Astron, Otto was employed by corporations engaged in similar businesses, including Solar Manufacturing Company, but he was retired from business occupations during the years 1947-1950. The officers of Astron from May 1950 until July 26, 1955, were Otto Paschkes, president; Joseph Frank, vice president, secretary, and treasurer; and Irving Black and John Fisher, vice presidents. They constituted the management group and also were directors. Each of those officers received salaries in the same equal amount. In 1954, each officer's salary was $41,181.80. They agreed to a reduction in salary to $35,000 a year, plus expenses, under new employment contracts on April 1, 1955. Those employment *43 contracts were for a period ending on December 31, 1956. When Otto died his salary was $2,916.66 a month, or $35,000 a year. In July 1955, Herman Rose and Richard H. Robinson became directors replacing Pauline and William Paschkes. Robinson was a partner in the securities firm of Van Alstyne, Noel & Company, New York City, which handled a public offering in 1955 of part of the common stock of Astron. At the meeting of the directors on July 26, 1955, Joseph Frank, a vice president, resigned from the additional offices of secretary and treasurer, and the following became officers: Irving Ser, secretary; George Sexton, assistant secretary; S. Newman, treasurer; and H. Mutz, assistant treasurer. The officers of Astron at the time of Otto's death were the same as on July 26, 1955, and included the above-named officers. After Otto's death, Joseph Frank became president, and on October 28, 1955, Astron's lawyer, William C. Davidson, became a director succeeding Otto. Astron was a closely held, private corporation. As of April 1, 1955, the outstanding stocks of Astron consisted of 3,900 shares of preferred and 445,000 shares of common stock. The stockholders were: Preferred Shares
Common Shares
O. Paschkes
2,450
194,000
I. Black
250
58,000
J. Frank
250
58,000
J. Fisher
250
58,000
Others 700
77,000
3,900
445,000
*44 On April 28, 1955, there was a public offering through Van Alstyne, Noel & Co., New York City, of 250,000 share of Astron's common stock, of which 200,000 shares were offered for sale on behalf of Astron Corporation, and 50,000 shares were offered on behalf of four selling stockholders, Otto Paschkes, Fisher, Frank, and Black. The public offering involved increasing the issued common stock from 445,000 to 645,000 shares. Van Alstyne received selling commissions of $120,000 from Astron, and $30,000 from the selling stockholders. The offering price per share to the public was $4 per share, the underwriting commission was 60 cents per share, and the net proceeds to the corporation and to the selling stockholders was $3.40 per share. In this offering, the shares offered for sale by the four selling stockholders were: Otto, 26,396 shares, and Fisher, Frank, and Black, 23,604 shares, or 7,868 shares each. In October 1956, 45,000 additional shares were offered for sale, by the estate of Otto Paschkes, 40,000 shares, and Fisher, 5,000 shares. After the public offering of the common stock in April 1955, the shares of common stock were held as follows: Otto Paschkes
167,604
I. Black
50,132
J. Frank
50,132
J. Fisher
50,132
Directors & officers as a group
323,500
Others 3,500
645,000
*45 At the time of his death, Otto owned 2,450 preferred shares and 167,604 common shares of the stock of Astron. On March 14, 1955, Astron borrowed $150,000, at 4 1/2 percent interest, from the Bank of Manhattan, now Chase Manhattan, payable in six semi-annual installments 1320 of $25,000, with the right to repay the loan after one year. Under the terms of the underwriting agreement with Van Alstyne, Noel & Co., Astron agreed that it would not declare or pay, and the selling stockholders, Paschkes, Black, Frank, and Fisher, agreed to waive, cash dividends on the 318,000 shares of common stock held by them, until the loan had been paid in full, or until April 30, 1956, whichever occurred later. A stockholder's waiver of cash dividends would end upon his death, and when Otto died his waiver ended. The agreement was made "to assist in the sale of the stock" to the public. Pauline Paschkes, through her husband, loaned $25,000 to Astron on August 4, 1950, and an additional $10,000 on October 2, 1950. These loans were evidenced by promissory notes payable on demand bearing 5 percent interest. These loans were made 5 years before Otto's death on October 25, 1955. They were repaid. *46 Otto became ill of cancer soon after joining Astron Corporation in 1950, and he was in and out of hospitals thereafter. The cause of his death was cancer. Otto was at home a great deal of the time during the year before his death and came to Astron's place of business only rarely. Meetings of the directors were held at the hospital where Otto was, on occasions, and at Otto's home. A directors' meeting on July 26, 1955, was held at Otto's home. He did not attend the meeting held on April 25, 1955. In spite of his illness Otto continued to participate in the management of Astron's business up to a few months before his death in October 1955. Upon the death of Otto, his employment contract and salary ended, and Astron was not obligated under any agreement or contract to continue to make payments of what had been his salary. Astron did not owe any back salary to Otto at the time of his death, and had paid him all of his salary during and prior to October 1955. Astron paid Otto's salary for the entire month of October 1955, the month in which he died. Astron did not have for its officers any pension plan; and at the time of Otto's death, it did not have any bonus plan. Therefore, when *47 Otto died, Astron was not obligated to pay any bonus with respect to his services, and there was not any pension plan under which his widow and dependents would receive any survivors' pension payments. Pauline did not receive any pension payments from Astron. However, Astron took out a small group insurance policy prior to the time of Otto's death under which about $10,000 was the amount of insurance receivable on Otto's life, which was received by petitioner. Otto was the first officer of Astron to die in office. Astron did not have any precedent or business policy for making any provision for or payments to a deceased officer's widow and dependents. Otto and Pauline were married in 1919. They had two daughters. Otto was survived by his wife and two daughters. In 1955, Pauline was about 61 years old. After her marriage, Pauline was never employed in any business pursuits. She was at all times a housewife and remained in her home. She does not have any social security. She was not college trained, and she did not have any business training. She was not acquainted with accounting or legal procedures. She never was employed by Astron, or asked to render any services to Astron. She *48 never was an officer of Astron. She was a rather inactive member of Astron's board of directors from May 8 to October 2, 1950, and from December 21, 1951, to July 26, 1955. She attended some of the directors' meetings but did not actively participate in them, and Otto voted her proxy at the meetings even when she was present. She was not paid anything for serving as a director. At the time of Otto's death, she owned individually 100 shares of Astron common stock. The petitioner and her brother, Joseph Frank, were the executors of Otto's estate. Petitioner was the principal beneficiary of her husband's estate, and she inherited outright one-half of Otto's preferred and common shares of the Astron stock. The two daughters inherited the other half of the shares of Astron stock under a trust. Upon the death of Otto, Pauline herself owned, individually, about $60,000 of Government bonds, and she received $40,000 of life insurance. At the time of Otto's death, there was a mortgage on the Paschkes residence. During the last year of Otto's illness, he and Pauline expended more money than Otto's income, due to large medical and nursing costs, and Pauline was obliged to sell some of her *49 bonds to obtain money for their living and medical expenses. For a period of time prior to Otto's death, they employed a nurse, maid, and chauffeur. 1321 On October 28, 1955, three days after Otto died, a regular meeting of Astron's board of directors was held. All of the directors were present, Frank, Black, Fisher, Robinson, and Rose. Frank acted as chairman. Black acted as secretary of the meeting and he made notes of what transpired. A stenographic secretary was not present, and the verbatim wording of the minutes was not made at the meeting. The minutes, and the formal wording of them and of the resolution involved here, were written later by someone in the office of Astron's attorney, Wilbur C. Davidson. Davidson was on a trip in Europe and Africa at the time of the meeting. Several matters were acted on at the meeting, including the election of Joseph Frank to the office of president, the election of Davidson to the board of directors, a resolution of tribute to Otto Paschkes, and the matter of making payments to Otto's widow. The minutes of this meeting, in the wording and form of the subsequently written and typed minutes, were not written at the directors' meeting *50 by Black or anyone present, but Black later signed the typed minutes after they were written in Davidson's office. At this meeting an oral resolution was offered and unanimously adopted to the effect that payments were to be made to Otto's widow at the same rate as Otto's salary when he died, and that the subject was to be reconsidered from time to time. The resolution did not fix a total sum to be paid or a period of time during which the payments would be made. When the minutes were written later by someone in Davidson's office, this resolution was worded to state that it had been "resolved" that Otto's salary be continued at the same rate as heretofore in force for him, until further action by the directors, but to be paid to his widow. Pursuant to the October 28 resolution, payments were made to petitioner during the balance of 1955 and in 1956 until the subject was again considered at a meeting of the directors on April 27, 1956. The payments made to petitioner under the October 28 resolution aggregated $17,499.97, which was equal to $2,916.66 a month for 6 months from November 1, 1955, to May 1, 1956. Otto's salary prior to his death amounted to $2,916.66 a month. At the time *51 of the trial of this case, the accounting records of Astron, which had ceased to exist due to a merger, could not be produced. Therefore, the evidence does not show exactly how and when the authorized payments were paid to petitioner. A directors' meeting was held on April 27, 1956, at which a majority of the directors were present, Frank, Black, Fisher, Robinson, and Davidson. Several corporate matters received action including a second resolution relating to payments to Otto's widow. As had happened before, an oral resolution was offered and unanimously adopted, and subsequently the minutes of the meeting were written in formal style by someone in Davidson's office, and Black signed the typed minutes. As finally written and typed, the April 27 resolution stated than an amount equal to the salary of Otto for one year, $35,000, was to be paid to his widow in 24 equal monthly installments commencing May 1, 1956. Pursuant to the April 27 resolution the monthly installments amounted to $1,458.33, which was the equivalent of one-half of the monthly salary received by Otto before his death, and the period of the payment of 24 installments beginning on May 1, 1956, extended to May 1, 1958. At *52 the above rate, Astron paid petitioner about $11,666.56 from May 1 to December 31, 1956; $17,499.84 during 1957; and $5,833.60 in 1958. Pursuant to the two resolutions, Astron paid directly to Pauline, not to Otto's estate, the total amount of $52,499.97 from November 1955 until May 1958. The amounts paid in each year were as follows: 1955
$ 5,833.33
1956
23,333.20
1957
17,499.84
1958
5,833.60
At the trial of this case, testimony about Astron's payments to Otto's widow was given by directors Black, Rose, Robinson, and Davidson. The other directors who had been present at the directors' meetings on October 28, 1955, and April 27, 1956, Fisher and Frank, did not give testimony at the trial of this case. Fisher died prior thereto, and Frank was in Texas, and was ill, at the time of this trial. Herman Rose voted at the meeting on October 28, 1955, in favor of the resolution to make payments to Otto's widow because, as a friend of the Paschkes family, he knew that the expenses of Otto's fatal illness had been "terrific" and that Pauline needed funds for family living expenses. He voted for the resolution with the understanding and on the basis that Astron's *53 payments to Pauline would be a gift. He did not believe that any benefit would accrue to Astron from making the payments to Otto's widow and his vote for the resolution was not made on the basis that benefits would accrue therefrom to Astron. 1322 Black voted in favor of the resolutions to make payments to Otto's widow because he believed that she needed funds for the support of herself and family during the period of adjustment following her husband's death, and because the medical expenses of Otto during his illness had been large. He voted for the resolutions with the belief and on the basis that the payments to Pauline were gifts to her. There was no discussion at the October 28 and April 27 meetings about any possible benefit to be realized by Astron from making the payments to Otto's widow, and he did not give any thought to such possibility in voting for the resolutions. He did not believe, in voting for both resolutions, that Astron was legally obligated to make the payments to Pauline on account of any terms in Astron's employment agreement with Otto. There was no agreement with Otto to continue to pay Otto's salary after his death. The payments to Otto's widow were *54 not voted for by the directors as, or in consideration for any waiver of dividends, which the executors might execute, on stock of Astron held by the estate. The payments to Otto's widow were made voluntarily by Astron, and the resolutions were voluntarily adopted by the directors, authorizing the payments to Pauline. Black did not regard the payments to be made to Otto's widow as a "continuation" of Otto's salary. The directors, in the resolutions adopted, fixed the amounts to be paid to Otto's widow by reference to Otto's salary, and voted to authorize the payments to Pauline in amounts equivalent to Otto's monthly salary, but the directors did not intend or mean that Otto's salary was to be continued after his death. Black did not know that Astron later took deductions in its tax returns for the payments to Pauline. Davidson, Astron's attorney, advised Pauline that in his opinion Astron's payments were not taxable income to her. Richard Robinson, a director, voted for the resolutions because the Paschkes were people of modest means and Otto had been very ill. He was then associated with the Van Alstyne securities firm but he had visited the Paschkes while Otto was ill, and had *55 discussed the public offering of Astron common stock with Otto. Robinson's intent in voting for the resolutions to make payments to Pauline was that Astron would be making a gift of the payments to her, and he considered the directors' action in adopting the resolutions as "a compassionate thing to do." He knew that Astron did not have any contractual obligations to make the payments to Otto's widow, or any business reason for doing so. He recalled that the directors' meetings were informal and that the minutes were written afterwards in a more formal way. He was not aware of the point on October 28, 1955, and April 27, 1956, that Pauline and Frank, as executors, might execute in the future a waiver of dividends on the common stock formerly owned by Otto and then held in his estate, and that possibility did not enter into his vote on each occasion in favor of the resolutions to make the payments to Pauline. Robinson knew that the block of Astron's common stock formerly owned by Otto and held in his estate was not readily marketable because under regulations of SEC then in effect Otto's stock could not be sold unless it was registered with SEC since those shares were the controlling *56 block of common stock. Moreover, in Robinson's knowledge and experience, if such controlling shares of stock of a closely held, small corporation (such as Astron was) were to be duly registered and offered for sale, that procedure would tend to have a depressing effect upon the market value of Astron's common stock. Davidson attended the directors' meeting on April 27, 1956. He voted for the resolution to make the payments to Otto's widow until May 1, 1958, of $1,458.33 per month, for the following reasons: He had known Otto for 20 years and had become his attorney in the 1930's. He believed that Astron should do something for Otto's widow. Also, he believed that making the payments to her would have a good effect on the morale of the executive officers, and was in accordance with similar actions by other corporations. He did not vote for the resolution for any reason related to any waiver of dividends which might be executed by the executors of Otto's estate, and that matter was not considered at the meeting of April 27. Davidson's opinion was that Otto had been fairly paid for his services to Astron. After each one of the directors' meetings on October 28, 1955, and April 27, 1956, the *57 minutes of each meeting were written in formal form and typed in Astron's lawyer's office. At that time the person who wrote the minutes in final form worded the resolutions authorizing the payments to 1323 Otto's widow to state that Otto's "salary" was "to be continued" and was "to be paid to his widow." Black, acting as secretary of both meetings, did not prepare the minutes as they were finally worded using words, continuation of salary. The discussion at the meetings was concerned with the major medical bills during Otto's illness and doing something for Otto's widow, and the oral resolutions presented and adopted at the meetings dealt with fixing the amounts of the payments to Pauline with reference to what would be "equivalent" to what had been paid to Otto as his salary. As of April 28, 1955, no dividends had been paid on the common stock since the inception of Astron. The par value of the common stock was 10" per share. Van Alstyne, Noel & Co. offered for sale to the public 250,000 shares of common stock pursuant to an underwriting contract with Astron in which Astron agreed that it would not declare or pay, and the selling stockholders agreed to waive, cash dividends *58 on the 318,000 shares of the common stock which the selling stockholders retained until (1) the bank loan had been paid in full, or (2) April 30, 1956, whichever was later, provided, that in the event of the death of any selling stockholder, or in the event of the sale of any of said 318,000 shares to the public, such restriction on and waiver of dividends would cease to apply to the shares held by a selling stockholder at the time of his death, or to the shares so sold to the public, as the case might be. After the occurrence of any of the above-stated events terminating such waiver of dividends on all or part of the 318,000 shares, dividends thereafter declared would be made payable with respect to the shares no longer restricted by a waiver. The selling stockholders waived dividends, to assist in the sale of the stock offered "by facilitating the per share payment of dividends in excess of an amount that the Company might otherwise be able to declare and pay under the restrictions contained in the loan agreement." There was no assurance as to future dividends as they were dependent upon future earnings, the financial condition of Astron, and other factors. The 318,000 shares of *59 common stock retained by the selling stockholders consisted of the 167,604 shares held by Otto Paschkes, and 150,396 shares held (50,132 shares each) by Black, Frank, and Fisher. Each one of the four selling stockholders executed waivers of dividends on the shares owned by him, but a waiver was to expire upon the death of the stockholder. Otto's waiver expired when he died. At the time of the adoption of the resolutions to make payments to petitioner, the 167,604 shares of common stock of Otto were held in his estate. His widow inherited outright one-half of them, 83,802 shares, and each of his two daughters became the beneficiary of one-half of the other 83,802 shares, i.e., of 41,901 shares each. Although the executors of Otto's estate were not obligated to execute waivers of dividends on the 167,604 shares held in the estate, they voluntarily executed three new waivers on November 4, 1955, July 30, 1956, and August 1, 1957. Each waiver was consented to by the beneficiaries of Otto's estate, Pauline and the two daughters. The first two waivers related to the 167,604 shares in the estate. The third waiver referred to only 126,804 shares. Each waiver referred to the then balance *60 of the bank loan debt which was $150,000 on November 4, 1955, $100,000 on July 30, 1956, and $50,000 on August 1, 1957. In each waiver the following was stated, some details being adjusted in the second and third waivers with respect to the balance owing to the bank: In order to induce Astron Corporation, a New Jersey corporation (the "Company"), to continue its present dividend policy, and in consideration of all dividends hereafter paid by the Company on its Common Stock, par value 10" per share, the undersigned, owners of 167,604 shares of such Common Stock, do hereby waive, with respect to such shares, any dividends (other than dividends payable in stock of the Company) which may be declared and paid on the Common Stock of the Company until (i) a loan in the principal amount of $150,000 made to the Company by Bank of the Manhattan Company (now The Chase Manhattan Bank) pursuant to a loan agreement dated as of March 14, 1955 has been paid in full, or (ii) June 30, 1956, whichever is earlier, whether or not dividends are paid to other holders of Common Stock of the Company. Each of the waivers was for a period ending on June 30, 1956, June 30, 1957, and April 13, 1958, respectively, *61 or earlier, if the bank loan should be fully paid. On November 10, 1955, the directors of Astron declared a quarterly dividend of ten cents a share on the shares of common stock entitled to receive a cash dividend, payable on November 30, 1955, exclusive of the 318,000 shares on which dividends had been waived. The minutes of this directors' meeting state that the executors and 1324 beneficiaries of the estate of Otto Paschkes had executed a waiver of dividends on the 167,604 shares held by his estate, to expire on June 30, 1956, (part of the 318,000 shares); and that "the executors and family in a spirit of cooperation and in order to further the interests and welfare of the Company had agreed and consented to such a continuation of the waiver." The minutes of the directors' meeting on November 10, 1955, do not state that Astron had agreed to give anything of any kind to the executors of Otto's estate, or any beneficiary thereof, in return for the new waiver of dividends on the 167,604 shares of common stock dated November 4, 1955, and expiring on June 30, 1956. The evidence in general does not show that Astron gave anything in return for any of the three waivers. In the early *62 part of 1956, another quarterly dividend of ten cents was declared on the common stock which was not covered by waivers of cash dividends, and the 318,000 shares were excluded from the dividend. The dividends on the common stock amounted to $65,400 as of November 30, 1955, and $65,400 early in 1956. The directors of Astron did not vote for the resolutions adopted on October 28, 1955, and April 27, 1956, authorizing the payments in question to Pauline, in consideration for, or with respect to, or in anticipation of any of the above-described dividend waivers; and at the meetings when those resolutions were adopted, there was no discussion of the possibility of the execution of the waivers by the executors of the estate, or the consent of the beneficiaries. Pauline never received from Astron any Internal Revenue tax-withholding statements (W-2), or any Internal Revenue income information returns. In each of its income tax returns for the calendar years 1955-1958, Astron included in its deductions for salaries and wages the total amount paid to Pauline in each of those years. Astron did not withhold any income tax from any of its payments to Pauline. The year 1955 is not involved *63 in this case. The death benefit exclusion from gross income of $5,000, allowed by section 101(b)(2)(A) of the Code, was allowed to Pauline for the taxable year 1955. That exclusion of $5,000 is not an offset against Astron's payments to Pauline during the years 1956, 1957, and 1958. Pauline did not include any of the payments received from Astron in her income tax returns for the years 1955-1958, inclusive. She regarded them as nontaxable gifts by Astron. Davidson advised her that the payments were not taxable income. However, she stated on her tax returns that she had received the payments from Astron and that they were not included in her taxable income because they were not received for services rendered. The respondent determined that Astron's payments represented taxable income of the petitioner, under section 61 of the Code, and he included them in her taxable income for 1956, 1957, and 1958. Ultimate Findings of Fact 1. The basic and dominant reason which motivated Astron's directors to authorize the payments to Otto's widow was to provide her with financial assistance during a period of adjustment following her husband's long illness and death, and their intention *64 was primarily to be helpful and sympathetic about her immediate monetary needs. The directors did not believe or consider that any benefit, economic or any kind, would be realized by the corporation or its business because of the payments. The directors on both occasions, intended that the payments would be of financial assistance to Otto's widow at a time when the income ended which formerly was provided for living expenses by Otto's salary. For that purpose the directors determined what the amounts of the periodic payments would be by referring to Otto's salary during the period before his death, and by fixing the amounts of the first 6 payments as the equivalent of his former monthly salary, but the directors did not intend to continue Otto's salary. After the first 6 months, the monthly payments were one-half of what had been Otto's monthly salary. In the formal resolutions written in Astron's lawyer's office, the use of such words as, "salary be continued", was an inept and incorrect statement of the oral resolutions and discussion which referred to Otto's former salary only as a measure of the authorized payments to his widow. All of the evidence and circumstances establish *65 that all of Astron's periodic payments to petitioner were intended to be and were gratuitously made, without the expectation of any return or benefit to the corporation, to assist petitioner out of 1325 sympathy and concern for her needs. The payments were made out of disinterested generosity, and the dominant motive of the directors was to provide the funds as a gift. The payments were nontaxable gifts. 2. Otto's waiver of cash dividends on his 167,604 shares of Astron common stock terminated upon his death. His executors and his widow were not obligated to continue his waiver, by executing new ones, under any contract previously executed by Astron with the bank and with the underwriter of the public offering of some of the common stock; or by any agreement between Astron and the executors, or between Astron and the beneficiaries of the estate, which related in any way to the resolutions authorizing the payments (in issue) to petitioner. The waivers were executed by the executors without any compulsion or obligation, in a spirit of cooperation. The payments to petitioner were not dividends and were not paid in lieu of dividends. Opinion The issue is whether the payments *66 by the Astron Corporation to the widow of its former president are to be treated as nontaxable gifts within the meaning of section 102(a) of the Code, or as taxable income, section 61(a), as respondent determined. The petitioner contends that Astron's directors were motivated solely by generosity, kindness, consideration for her needs, and sympathy; that no benefit to Astron from the payments was anticipated, expected, or actually received; and that the dominant and only reason of the directors in voting for the resolutions authorizing the payments was that the payments would be gifts. Petitioner contends, further, that the directors did not vote to continue Otto's salary (and pay it to her), and that they referred to his salary only as a yardstick for measuring the amounts that would be transferred and given to her. Petitioner cites Florence S. Luntz, 29 T.C. 647; Poyner v. Commissioner, 301 F. 2d 287, remanding 35 T.C. 65; and Fanning v. Conley, 357 F. 2d 37 (C.A. 2, 1966). The respondent's contentions are directed mainly to the argument that a realistic appraisal of the circumstances existing at the time of the directors' *67 meeting on October 28, 1955, requires a conclusion that the resolutions authorizing the payments were motivated by considerations of certain benefits to the corporation and its best interests, rather than by disinterested generosity and an intention to make gifts. The circumstances with which respondent's argument are concerned are chiefly that the executors of Otto's estate, the petitioner and her brother, executed, after each resolution was adopted, waivers of dividends on the common stock held in the estate, in continuation of the waiver executed by Otto, which had been terminated by his death; and that the salary formerly paid to Otto was referred to as a measure of the payments to petitioner. Respondent refers to McCarthy v. United States, 232 F. Supp. 605; Gaugler v. United States, 312 F. 2d 681 (C.A. 2, 1963); and Roy I. Martin, 36 T.C. 556, affd. 305 F. 2d 290 (C.A. 3, 1962), cert. denied 371 U.S. 904. Both parties call attention to the standards stated in Commissioner v. Duberstein, 363 U.S. 278 (1960). Duberstein provides *68 guidelines for weighing the evidence and making the necessary factual determinations, and directs the fact-finder to search out in each case the "dominant reason" for the transfer of funds to the recipient. If the dominant reason "is sufficiently divorced from its business background, a nontaxable gift results." Fanning v. Conley, supra, affirming 243 F. Supp. 683. The evidence has been closely scrutinized to determine the dominant reason and the real intent of the corporation's directors in authorizing the payments to the petitioner. Our findings are dispositive of the factual questions involved. The following facts have been considered in arriving at our findings and conclusions: At the time Astron's directors resolved to make periodic payments to petitioner, Otto Paschkes had been fully compensated for his services and Astron was not indebted or obligated in any other way to Otto, or to his widow. In the first resolution, a period of time in which the payments would be made was not fixed, but it was provided that the subject would be reconsidered from time to time. Six months later, on April 27, 1956, the matter was given further consideration; the *69 second resolution was adopted in further recognition of Otto's long, faithful, and valuable services; and the amount of the payments was fixed at $35,000, to be paid to Otto's widow in 24 monthly installments of $1,458.33, from May 1, 1956, to May 1, 1958. Payments were made over a period of 30 months in the total sum of $52,499.97. 1326 Astron, a new corporation organized in 1949, did not have any pension plan for its officers or a surviving widow. Otto was the first officer to die while an officer. Astron did not have any precedent or policy about making any payments to an officer's widow. Astron did not withhold for taxes any portion of the payments to petitioner, and did not send her any W-2 withholding notices or income information returns. However, it included the payments to petitioner in its deductions for salaries and wages on its tax returns. Petitioner treated the total sum received in each year, on her income tax returns, as nontaxable gifts, stating that she had received them but they were not compensation for services. Astron's attorney advised petitioner to disclose on her tax returns her receipt of the payments, and he told her that in his opinion they were *70 not taxable income to her. The respondent determined that the first $5,000 (received in 1955, a year which is not before us) was exempt from tax under section 101(b) of the Code, [1] and that the balance of the payments (received in the taxable years 1956-1958) were deemed to be taxable income under section 61. This determination is discussed hereinafter. The directors of Astron on October 28, 1955, were Joseph Frank, Irving Black, John Fisher, Richard Robinson, and Herman Rose. All of the directors attended that meeting. All except Fisher, deceased, and Frank, *71 who was ill, gave testimony at the trial of this case about the reasons and motives for authorizing the payments to Otto's widow. A majority of the directors attended the directors' meeting on April 27, 1956, namely, Frank, Black, Fisher, Robinson, and Wilbur C. Davidson. All of them except Fisher and Frank testified about their reasons for voting for the resolution adopted on April 27, 1956. Black acted as the secretary of both meetings. All of the four directors who testified characterized the payments to petitioner as gifts, and each one stated in his own way that it was his intention in voting for the resolution, or resolutions, to "do something" for the widow, to "tide her over an adjustment period", and that it was "the thing to do considering the long association with the decedent." More specifically, the directors testified as follows: Davidson testified that his primary motive in voting for the April 27, 1956, resolution was "To do something for Mrs. Paschkes." Rose testified that he was very close to Mr. and Mrs. Paschkes and knew that they were under a terrific expense for his sickness, and "out of just humanity's sake, knowing that she needed the money bringing up two *72 daughters at the same time, I voted on that basis to give her the gift." He also testified that there absolutely was not any benefit to the Astron Corporation which motivated him to vote for the resolution of October 28, 1955. Black testified that he had known Otto since 1928; that he had known Mrs. Paschkes for several years prior to 1955, and knew her age; that she never had worked outside her home; that Otto had been ill; that there was discussion about the large medical bills connected with Otto's last illness; and that his intention in voting for the resolutions was to do something for the widow and to grant her a gift, particularly in view of so many years of Otto's association with the company, so that she could "continue to support herself" until she could make adjustments. Black testified further that he could not recall any discussion or reference at the directors' meetings of any economic benefit that Astron would receive from making the payments to Otto's widow; that he believed that question did not come up; and that he did not believe or understand that Astron would receive any benefit, return, or get anything as a result of transferring funds to Mrs. Paschkes. He testified *73 that Astron was not legally obligated to make any payments to Otto's widow under its contract of employment with Otto, and that upon Otto's death his salary ended, and there was no agreement of Astron to continue to pay Otto's salary after his death. Robinson testified he had visited Otto at his home while he was ill, where he met 1327 Mrs. Paschkes; that the Paschkes lived in moderate circumstances; that his intent in voting for both resolutions was that the payments were to be a gift to Otto's widow; that his only thought was that in view of Otto's long illness prior to his death, it was a "compassionate thing to do". He testified that Astron was not under any contractual obligation to make the payments to the widow, and that there was no business reason for Astron's making the payments. Careful consideration has been given to the matter of the execution, after the resolutions were adopted, of three waivers by the executors of Otto's estate, Pauline Paschkes and Joseph Frank, of cash dividends on the 167,604 shares of common stock held by the estate. The waivers also were signed by the beneficiaries of Otto's estate, Mrs. Paschkes and her two daughters. Respondent argues *74 that there is an inference to be drawn, from the general circumstances, which is that the directors voted for the resolutions authorizing the payments to petitioner with the expectation that she and her co-executor would execute waivers of dividends on the 176,604 shares, and that the execution of the waivers would be of benefit to Astron, and, therefore, the payments were not gifts. This is one of respondent's main contentions. It is our best judgment that there is very little merit in respondent's argument. This contention is a nebulous one. We have tried to find but are unable to ascertain what the alleged economic benefit to Astron could have been or was. Under the underwriting agreement for the offering of common stock to the public, Otto, Fisher, Black, and Frank agreed to waive dividends on their combined holding of 318,000 shares until Astrone had paid its bank loan. Otto held 167,604 shares, and the other three held 150,396 shares. It was provided that a waiver would end upon the death of a stockholder. Otto died. No one was obligated to execute any new waiver of dividends on the 167,604 shares held in Otto's estate. As long as each one of the other three lived, his waiver *75 continued in effect. At the time the resolutions were adopted to make the payments in issue to Otto's widow, the other three were living and their waivers on 150,396 shares were in effect. No dividends on the common stock ever had been declared, and as of October 28, 1955, no dividend had been declared. If and when a dividend on the 167,604 shares held in Otto's estate might be declared, if no waiver had been executed by the executors, it would be payable to Otto's estate. A dividend of ten cents a share was declared on November 10, 1955, on the common stock which was unrestricted by waivers. If the dividend had been paid to Otto's estate, it would have amounted to $16,760.40. If the executors could have distributed that income, Mrs. Paschkes could have received 50 percent, or $8,380.20. But there is no evidence relating to whether or not the estate could have made any distribution of such income to the beneficiaries of the estate. As of November 10, 1955, the directors did not know, as far as the evidence shows, that another dividend might be declared in the spring of 1956. The evidence does not show that if the estate had received the second dividend of ten cents a share in the spring *76 of 1956, the executors could have distributed that income to the beneficiaries of the estate, such as a distribution of $8,380.20 to Mrs. Paschkes. Respondent does not argue that the payments in dispute to petitioner, authorized on October 28, 1955, and April 27, 1956, were intended to be, or were, in lieu of any dividends that might be declared and paid on the 167,604 shares held in Otto's estate. The evidence does not establish any correlation or connection between the resolutions of October 28 and April 27, and the waivers executed later by the executors of the estate. Respondent does not cite in support of his contention any of the following cases, or similar ones: Lengsfield v. Commissioner, 241 F. 2d 508 (C.A. 5, 1957); Schner-Block Co., Inc. v. Commissioner, 329 F. 2d 875 (C.A. 2, 1964); or Jordanos', Inc. v. Commissioner, 396 F. 2d 829 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court. In those cases, for example, it was held that payments by a corporation constituted dividends and were not gifts. The evidence does not establish a correlation between the amounts of dividends which might have been paid to the estate on the *77 167,604 shares held in the estate and the amount of the payments to petitioner which are in issue. Black and Robinson testified that when each of the resolutions authorizing the payments in dispute were discussed on October 28 and April 27 there was not any discussion about the possible execution by the executors or waivers of dividends on the shares held in the estate. 1328 Each one testified that his vote for each resolution was not due to any consideration of a possible, subsequent execution of waivers by the executors, and that the resolutions were not adopted as a consideration for a subsequent execution of waivers by the executors. Rose and Davidson testified to the same effect. Since the testimony of the four directors was not rebutted or contradicted, their testimony is entitled to receive some weight in our consideration of all of the facts and circumstances. Respondent's argument that Astron received a business or economic benefit from making the payments in dispute to petitioner is oriented toward his argument that there was a connection between the later execution of the waivers by the executors and Astron's payments to petitioner. Once that argument of respondent *78 is rejected, as must be concluded, his argument falls, that the payments in issue were motivated by consideration of benefits to Astron's business. Respondent's argument is tenuous and is based upon inference rather than fact. Within the framework of all of the evidence, respondent's argument about the executors' execution of new waivers, which they were not obligated to execute, is without substance and is rejected. The general issue is a Duberstein issue. Our task is to weigh all of the evidence and facts in order to determine the "dominant reason" of Astron for making the transfers of funds to petitioner. As was noted in Duberstein, the resolution of the issue must be based ultimately on the application of the trial court's experience as a trier of facts to the totality of the facts in a particular case. Duberstein cautions against the concept that a corporation's payments of some of its funds cannot constitute a gift under any circumstances. During the trial of this case, respondent's counsel directed questions to Davidson, who had been Astron's attorney, which were to the effect that *79 it might be considered an ultra vires giving away of Astron's funds for its directors to adopt the resolutions authorizing the payments to petitioner. The point about the propriety of the payments as a matter of fiduciary or corporate law was raised by respondent's counsel during the trial. In answer, Davidson testified that there was no impropriety about the resolutions and the payments; that the corporation could make a gift of some of its funds, when duly authorized to do so; and that he had advised petitioner that Astron's payments were not taxable income to her. In weighing all of the evidence and facts, we have exercised care not to consider the evidence within the context of the "test" which the Government suggested in Duberstein, which was rejected, namely, that a corporation's payments of its funds never can constitute a gift. Another aspect of respondent's determinations should be noted. The taxable year 1955 is not before us because respondent treated Astron's payments as an employee's death benefit under section 101 (b)(2)(A) of the Code, limited to an exclusion of $5,000 from gross income. That determination of the respondent presumably was made on the basis that Astron's *80 payments to petitioner qualified as a gift [2] excludable from her gross income under section 102(a) of the Code, but even so, only $5,000 of such gift was nontaxable. Then later, in this Court, respondent departed from his original view and took the position that none of the payments were gifts. But the year 1955 was not brought into this case. It is significant that in Rev. Rul. 62-102, 1962-2 Cum. Bull. 37, the Commissioner abandoned his former contention that section 101(b) of the Code "applies to limit to $5,000 the exclusion from gross income of an amount paid to the widow of a deceased employee, where the payment otherwise qualifies as a gift excludable under section 102(a) of the Code," and that accordingly he modified Rev. Rul. 60-326, 1960-2 Cum. Bull. 32. In Rev. Rul. 62-102, supra, it was stated that the Internal Revenue Service will continue to argue "that widows' payments generally are not gifts." That broad assertion of the Government, however, was rejected in Duberstein. *81 The statutory deficiency notice giving rise to this case is dated May 12, 1965. We are unable to find an explanation for the respondent's inconsistency, due to his 1329 original treatment of the first $5,000 of Astron's payments to petitioner as excludable from petitioner's gross income, as part of payments which otherwise qualified as a gift excludable under section 102(a), and his later contention here that none of Astron's payments qualified as a gift to petitioner. Of course, the year 1955 may have become a closed year. Finally, we reach the basic question whether Astron's payments to petitioner during the taxable years before us, 1956, 1957, and 1958 were nontaxable gifts under section 102(a), rather than taxable income under section 61(a)(1). It is concluded that the payments constituted nontaxable gifts. The factors supporting this conclusion are that the services of Otto had been fully compensated; petitioner did not perform any services for the corporation; there was no obligation of the corporation to pay any additional compensation to Otto; the payments were not made to his estate but were paid to petitioner; and Astron did not derive any benefit from the payments. *82 The element of doubt consists of the part of the wording of both resolutions referring to "continuation" of Otto's former salary. Petitioner has overcome this element of doubt through the testimony of the former directors that it was not their intention that the payments would be a "continuation" of the deceased officer's salary. Their testimony is that his salary ended with his death and was not continued on the corporation's payroll and books; and that the reference to Otto's salary was only to establish a measurement of the amount of the payments to be made to his widow. Parole evidence from the corporate directors who were present at the directors' meetings when the resolutions were adopted is receivable for the purpose of enabling the Court to go beyond the formal resolutions and ascertain the motivations and dominant reason for the conduct of the directors in adopting the resolutions authorizing the payments. In making the necessary factual determination, we are not bound by the terms of any formal corporate resolution which would characterize the transfer of funds as a gift or otherwise. *83 See Evans v. Commissioner, 330 F. 2d 518 (C.A. 6, 1964), affg. 39 T.C. 570; and Estate of Olsen v. Commissioner, 302 F. 2d 671 (C.A. 8, 1962), reversing a Memorandum Opinion of this Court. The corporation's treatment of the transfers of funds for income tax purposes, while an element to be considered, is not a decisive indication of whether the transfers of funds were gifts or some form of compensatory payment. In similar situations a finding has been made, United States v. Frankel, 302 F. 2d 666 (C.A. 8, 1962), that the transfer of funds to the widow of a deceased corporate officer was a nontaxable gift, even though a deduction was taken by the corporation as a part of wages and compensation. See Poyner v. Commissioner, supra, where the description of the payment as "a continuance of [decedent's] salary was not a bar to finding a nontaxable gift; Estate of Kuntz v. Commissioner, 300 F. 2d 849, cert. denied 371 U.S. 903 (1962), where the description of the disbursement as "additional compensation *84 and in consideration of services" did not control; and Fanning v. Conley, supra. We are satisfied that the testimony of the former directors should be given credence and considerable weight; and that the formal resolutions, as written after the meetings in Astron's attorney's office by someone who was not present at the directors' meetings, in each instance, were ineptly worded by using words which did not reflect the actual intentions and motives of the directors. Upon the entire record and all of the facts and circumstances, this Court is of the opinion and finds that the dominant reason for the authorizations of the transfers of funds by Astron to petitioner were out of only motives of sympathy, detached and disinterested generosity, and the desire to assist petitioner financially during the period of adjustment following her husband's illness, the expenses thereof, and the bereavement suffered. The directors' meetings were conducted informally. The directors' expressions of sympathy in a separate resolution adopted at the same time on October 28, 1955, and their evident feelings of closeness and sympathy for the Paschkes family clearly indicate that the dominant *85 motive of the directors was that the transfers of funds were gifts rather than transfers made out of consideration of corporate business interests, such as were present in Gaugler v. United States, supra.No business benefit to Astron is discernable as a result of the 1330 transfers of funds to petitioner. It is concluded that the domonant reason for the corporation's payments was to make gifts of funds to petitioner. A Rule 50 recomputation appears to be unnecessary. Decision will be entered for the petitioner. Footnotes
1. SEC. 101. CERTAIN DEATH BENEFITS. * * * (b) EMPLOYEES' DEATH BENEFITS. - (1) GENERAL RULE. - Gross income does not include amounts received (whether in a single sum or otherwise) by the beneficiaries or the estate of an employee, if such amounts are paid by or on behalf of an employer and are paid by reason of the death of the employee. (2) SPECIAL RULES FOR PARAGRAPH (1). - (A) $5,000 LIMITATION. - The aggregate amounts excludable under paragraph (1) with respect to the death of any employee shall not exceed $5,000.↩
2. Rev. Rul. 62-102, 1962-2 Cum. Bull. 37, states: The Internal Revenue Service will no longer contend that section 101(b) of the Internal Revenue Code of 1954 applies to limit to $5,000 the exclusion from gross income of an amount paid to the widow of a deceased employee, where the payment otherwise qualifies as a gift excludable under section 102(a) of the Code. * * * The Service will continue to argue * * *, that widows' payments generally are not gifts.↩